# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2612

_____

Marchello McCaster,     *
    *
       Plaintiff - Appellee,     *
    *
       v.     *
    *
Mary Clausen; Audrey Darling;     *     Appeal from the United States
Nancy Mattson; Julie Nelson; and     *     District Court for the
Patti Vodinelich,     *     District of Minnesota.
    *
       Defendants - Appellants,     *
    *
County of Ramsey; Jeff Allen; and     *
Al Carlson,     *
    *
       Defendants.     *

_____

Submitted: March 15, 2012
Filed: July 12, 2012

_____

Before MURPHY, BRIGHT, and GRUENDER, Circuit Judges.

_____

MURPHY, Circuit Judge.

Marchello McCaster had active tuberculosis at the time he was admitted to the Ramsey County Correctional Facility to serve 56 days for fifth degree assault. His condition worsened, and he was transferred to a hospital emergency room two days before he was scheduled for release. Claiming that nursing staff, jail administrators,

and Ramsey County had been deliberately indifferent to his serious medical needs in violation of the Eighth Amendment, McCaster brought this action under 42 U.S.C. § 1983. The district court granted summary judgment on immunity grounds to the administrators and the county but denied summary judgment to five nurses. The nurses appeal. We affirm in part and reverse in part.

I.

At the time McCaster was admitted to the Ramsey County Correctional Facility on April 17, 2008, he was 25 years old and had active tuberculosis. He had also already unknowingly infected members of his own household. McCaster lost over 40 pounds and became extremely ill while he was in the jail. One tuberculosis expert testified that he was "near death" upon arriving at the hospital emergency room.

Minnesota requires prisons and jails to screen incoming inmates for tuberculosis due to its high risk of transmission in confined spaces with limited ventilation. Minn. Stat. § 144.445. Tuberculosis is spread through airborne droplets expelled from the lungs of a person with the active disease by coughing, talking, and sneezing. Courts have long recognized that "[p]risons are considered high risk environments for the transmission of tuberculosis." DeGidio v. Pung, 704 F. Supp. 922, 924 (D. Minn. 1989), aff'd 920 F.2d 525 (8th Cir. 1990). Minnesota correctional facilities have been subject to past judicial scrutiny for inadequate surveillance and control practices. Id. at 954–60.

Effective disease control requires systematic skin testing followed by chest x-rays for individuals with positive reactions. DeGidio, 704 F. Supp. at 925. If an x-ray reveals signs of active tuberculosis, infectiousness should be confirmed by a culture of sputum or phlegm produced through coughing. Id. To control the spread of the disease, inmates with inactive tuberculosis should be treated with preventive antibiotics and those with active tuberculosis should be isolated and treated until no

longer infectious. Id. at 926. In the Mantoux skin test a derivative of the disease is injected under the skin of the forearm. The injection site should be examined between 48 and 72 hours later to check for a bump or induration. Test results read before 48 hours or after 72 hours of the time of injection are not valid. Tests can produce false negatives and false positives even when read within the correct window of time.

On McCaster's arrival in the Ramsey County jail he met with nurse Nancy Mattson who performed his intake exam. He filled out several medical forms, did not report any medical problems, and responded affirmatively to the question of whether he had "lost or gained as much as two pounds a week for several weeks without even trying." Mattson recorded McCaster's weight as 200 pounds and took his vital signs. She noted in his chart that his pulse rate was elevated, a factor which combined with weight loss can be a sign of active tuberculosis disease. Mattson did not ask McCaster about his weight loss or other symptoms, and McCaster did not express any complaints. Mattson administered the Mantoux test and did not interact with McCaster again during his incarceration.

Two days later McCaster saw nurse Audrey Darling who read the results of his Mantoux test between 32.5 and 43.5 hours after the injection. Darling and the facility's health services supervisor were aware that a test result is invalid if read too early, but they concede that it was the practice at the jail to read Mantoux results two days after the injection was administered without ensuring that at least 48 hours had elapsed. Nurse Darling noticed an induration on McCaster's forearm but did not measure it. An induration measuring less than ten millimeters in diameter is considered negative for tuberculosis. Darling initially noted in McCaster's chart that the induration was zero millimeters but later changed the result to five millimeters.

McCaster did not interact with nursing staff between April 19 and May 21, but the record shows that his health substantially deteriorated during that period. Recordings of his telephone calls indicate that McCaster was coughing regularly at the

time he was admitted and that his cough was significantly worse by mid May. Several correctional officers who saw McCaster within two or three days of his admission described him as visibly ill and as a "very sick inmate." A correctional officer testified that within several weeks of his admission she was standing next to the nurses' clinic when McCaster walked past her. She asked nurse Patti Vodinelich "what was wrong with him because he looks pretty sick." Vodinelich responded that she did not know. Inmates described McCaster as barely able to walk at about that time and routinely coughing up blood. One inmate later testified that those housed near McCaster were covering their mouths with towels because of their concern about being infected as a result of his severe cough.

Inmates and correctional officers also sought medical attention on McCaster's behalf. Two different officers called the nurses station to report McCaster's illness. One was told by a nurse that McCaster should submit his own medical request, and the other was told that the nurse was "aware of [McCaster's] condition." It is not clear with which nurse the officers had spoken, but Mary Clausen, Julie Nelson, and Patti Vodinelich were in a position to receive those calls because of the shifts they worked. Inmates submitted many written requests for medical attention for McCaster which were signed by multiple prisoners due to concern for him and for themselves. Although the paper requests have been lost, testimony from inmates indicates that they submitted the requests both in the morning and at night, trying to reach nurses on different shifts in the hope that one might respond.

Julie Nelson acknowledged seeing a medical request signed by several inmates, but denied reading the content of the request beyond noting that the inmate it concerned had not signed the request himself. Although Nelson stated that nurses were told not to respond to requests that had not been signed by the sick inmate himself, the health services supervisor denied that this was the policy at the facility. A correctional officer recalled handing Mary Clausen ten to twelve medical requests from inmates on May 22, nearly all of which discussed McCaster's health. The officer

told Clausen, "Look at all the [medical requests] on this guy." Clausen asked if any of the requests were signed by McCaster. When he responded "no," she said that "[h]e needs to sign his own [medical request]."

Expert medical testimony supports the inmate and officer accounts of McCaster's worsening condition. Dr. Lee Reichman, an expert on tuberculosis, stated that McCaster must have been exhibiting a symptomatic cough throughout his incarceration because he had already infected family members and then continued to transmit the disease to other people in the jail. Dr. William Fithian, an expert in correctional medicine, stated in his deposition that McCaster "would certainly have had a productive cough and probably associated fever, chills, night sweats and lethargy." Mattson and another nurse at the jail, who was dismissed from this action, testified that the amount of weight loss McCaster experienced would have been striking.

Mary Clausen examined McCaster on May 21 in response to his request for medical attention to address an infection in his mouth. Clausen observed that McCaster's right jaw was "grossly swollen." She prescribed a ten day course of penicillin, but she did not check his vital signs or perform an examination beyond assessing the infection in his mouth. This evaluation lasted approximately ten to fifteen minutes. Six days later McCaster sought medical attention for his feet, stating that he could barely walk. Clausen examined McCaster's feet on May 28 and recommended that he change his shoes and elevate his feet. She did not check McCaster's vital signs or examine him further. McCaster did not raise other medical concerns with Clausen during these evaluations.

From May 21 until June 4 McCaster received daily doses of penicillin at the medication call window. Julie Nelson gave McCaster his medication approximately nine times and Vodinelich distributed it three times. Before giving an inmate his medicine, the nurses had to verify his identity by looking at the inmate's wristband

which had on it his intake photograph. Each interaction between Nelson or Vodinelich and McCaster lasted less than a minute. Although McCaster did not complain about his health to Nelson or Vodinelich when he received his medication, he missed several doses of penicillin because he could not get out of his bed.

McCaster submitted expert testimony discussing his appearance and the advanced stage of his illness at the time Mary Clausen, Julie Nelson, and Patti Vodinelich saw him. Dr. Michael Iseman, a tuberculosis expert, described McCaster as "near death" when he was transferred to a hospital emergency room in early June. Dr. Iseman explained that tuberculosis "evolves over weeks and in some cases months" so that it was therefore "improbable" that a trained health professional who saw McCaster in late May "would not have perceived an individual who is ill." An expert hired by Ramsey County after the tuberculosis outbreak was discovered to evaluate the jail's prevention and control program also agreed that he "would have expected a nurse, in 54 days, to notice a person becoming this sick."

A corrections officer testified that on June 9 McCaster was incoherent, moved slowly, and appeared very sick. The concerned officer called Patti Vodinelich and asked her to see McCaster. Instead of complying Vodinelich responded that McCaster should submit his own medical request. The officer protested that McCaster was not in a condition to submit his own requests. Vodinelich answered that McCaster is "going to get out in a couple of days[;] he can go see his own doctor." The officer then spoke to his lieutenant who arranged for McCaster to be transported to see Vodinelich. After she saw McCaster and checked his vital signs, Vodinelich had him transferred to the emergency room. At that time, McCaster's pulse was significantly elevated, and he had a fever of nearly 103.

The record from McCaster's admission to the hospital said he was "[c]hronically sick looking, emaciated, (looks thinner than in picture noted on his wristband)," referring to the wristband he was given during intake at the jail. McCaster was

diagnosed with pulmonary tuberculosis, malnutrition, cavitary lung disease, pericarditis, pericardial effusion, and acute demyelinating polyneuropathy among other conditions. He remained at the hospital for three and a half months.

McCaster brought this § 1983 action against Ramsey County and several nurses, administrators, and correctional officers at the jail, claiming deliberate indifference to his serious medical needs. Over 80 inmates and jail officials brought a separate action based on the tuberculosis outbreak caused by exposure to McCaster; that suit has been settled. McCaster dismissed the correctional officers and several medical staff from this action, and the remaining defendants moved for summary judgment. The district court decided that the administrators and Ramsey County were immune from suit and dismissed them, but it denied summary judgment to the nurses. The court concluded that they were not entitled to qualified immunity, and they appeal. McCaster has moved to dismiss their appeal, asserting that we lack jurisdiction to review the district court's decision.

II.

We first address McCaster's challenge to our appellate jurisdiction. Because a district court's order denying summary judgment is not a final decision, we ordinarily lack jurisdiction to review an immediate appeal. 28 U.S.C. § 1291; see Langford v. Norris, 614 F.3d 445, 455 (8th Cir. 2010). We nevertheless have limited authority to review the denial of qualified immunity under the collateral order doctrine. Johnson v. Jones, 515 U.S. 304, 311–12 (1995). Such jurisdiction extends to reviewing "abstract issues of law," but not to "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." Johnson, 515 U.S. at 317, 319–20; see also Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009). We are thus able to review the "purely legal" issue of whether the facts, taken in the light most favorable to McCaster, would support a finding that any of the nurses violated his clearly

established constitutional right. <u>Langford</u>, 614 F.3d at 455 (citing <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 528 n.9 (1985)).

The district court denied qualified immunity based on its conclusion that "there exists sufficient evidence from which a jury could find that each nurse was deliberately indifferent to McCaster's serious medical needs." The nurses challenge the district court's conclusion that the record could support such a finding. This appeal thus requires us to "examine the information possessed by the government official accused of wrongdoing in order to determine whether, given the facts known to the official at the time," any nurse would have known that McCaster had a serious medical need and deliberately disregarded it, a legal determination within our jurisdiction. <u>Miller v. Schoenen</u>, 75 F.3d 1305, 1308 (8th Cir. 1996). Accordingly, we deny McCaster's motion to dismiss the appeal.

### III.

Qualified immunity shields government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). To determine whether the defendants are entitled to qualified immunity, we examine (1) whether the facts alleged or shown, construed in the light most favorable to McCaster, establish a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that her actions were unlawful. <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009). The defendants are entitled to qualified immunity unless the answer to both of these questions is yes. <u>Krout</u>, 583 F.3d at 564. We review the district court's denial of qualified immunity de novo, viewing the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in his favor. <u>See</u> <u>Johnson v. Carroll</u>, 658 F.3d 819, 825 (8th Cir. 2011).

It is well established that deliberate indifference to a inmate's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment. Nelson v. Corr. Med. Servs., 583 F.3d 522, 531–32 (8th Cir. 2009) (en banc) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). To establish deliberate indifference, "plaintiffs must prove an objectively serious medical need and that prison officials knew of the need but deliberately disregarded it." Id. The second part of the test requires McCaster to prove that the nurses were more than negligent. Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006). Rather, McCaster must show that the nurses' mental state was "akin to criminal recklessness." Gordon ex. rel. Gordon v. Frank, 454 F.3d 858, 862 (8th Cir. 2006).

The nurses do not contest that McCaster had an objectively serious medical need, nor do they claim that McCaster received adequate care for his tuberculosis before his transfer to the emergency room. It is also not disputed that the nurses had a constitutional obligation to address adequately any serious medical need of which they had been aware. Thus, if the nurses had known that McCaster required medical attention but did not provide it, the unlawfulness of failing to respond to such need would have been apparent to a reasonable official. See Langford, 614 F.3d at 461. McCaster can show the nurses' actual knowledge of his serious medical need "in the usual ways, including inference from circumstantial evidence." Farmer v. Brennan, 511 U.S. 825, 842 (1994). A factfinder may conclude that a prison official knew of a prisoner's medical need from the very fact that it was obvious. See id. McCaster need not establish that the nurses knew specifically that he was suffering from tuberculosis, only that he had a serious medical need. See Jenkins v. Cnty. of Hennepin, Minn., 557 F.3d 628, 633 (8th Cir. 2009).

Appellants contend that the record is insufficient to allow a factfinder to conclude that any nurse actually knew of McCaster's serious medical need. As discussed, in an interlocutory appeal we "take, as given, the facts that the district court assumed" when it viewed the record in the light most favorable to McCaster and

concluded that the nurses were not entitled to qualified immunity. <u>Johnson</u>, 515 U.S. at 319; <u>Langford</u>, 614 F.3d at 461. We discuss the evidence of each nurse's knowledge in turn.

Nancy Mattson's only contact with McCaster was during his intake exam on April 17, 2008. She noted his elevated pulse and received his affirmative response to the question of whether he had gained or lost as much as two pounds a week without trying. The record includes evidence that McCaster was likely coughing some at this time, but not to the degree as later in his incarceration. McCaster weighed 200 pounds when Mattson saw him and was relatively young. He did not complain of medical issues to her directly or on the screening form. Although several officers and inmates commented that McCaster appeared sick when he arrived at the jail, the record also indicates that McCaster played basketball within several days of his intake exam. On this record, Mattson may have been negligent in failing to perceive or further investigate McCaster's signs of illness, but the evidence is insufficient to support a finding that McCaster's illness on April 17 was so obvious that Mattson perceived a serious medical need but deliberately disregarded it.

McCaster saw Audrey Darling two days later. Darling's interaction with McCaster lasted approximately two minutes and was confined to reading the result of his Mantoux test. Appellants concede that McCaster's Mantoux result was not read correctly, but that error does not show that Darling was deliberately indifferent to McCaster's serious medical need. Given the limited duration and scope of Darling's interaction with McCaster, the record would not allow a factfinder to conclude that Darling actually knew that McCaster was in serious need of medical attention but failed to respond. Mattson and Darling are thus entitled to qualified immunity, and we reverse the district court's order denying summary judgment with respect to them.

Mary Clausen examined McCaster on May 21 and May 28, over a month into his incarceration. By this time, there is evidence that McCaster's cough was persistent

and severe, that he was having difficulty walking, that he had experienced significant weight loss, and that he was spending most of his time in bed with chills and sweats. The record also supports a finding that inmates and prison guards repeatedly requested medical attention on his behalf but had been told that McCaster had to ask for it himself. The requests were submitted at different times in order to reach different nurses and increase the likelihood that someone on the nursing staff would respond to McCaster's needs. Based on their duty hours, a factfinder could infer that Clausen, Nelson, and Vodinelich received these requests. One correctional officer testified that he recalled giving ten or twelve requests to Mary Clausen on May 22, the day after she saw McCaster the first time and before she examined him the second time. Most of those requests discussed McCaster's medical needs.

Clausen's contact with McCaster included examination of an advanced infection in his mouth and a later evaluation of severe and unexplained pain in his feet, which is consistent with the diagnosis of polyneuropathy he received at the hospital. Expert testimony confirms that McCaster became increasingly symptomatic during his incarceration as do the recordings of his calls. Clausen saw McCaster two weeks before he was admitted to the emergency room "emaciated" and "near death." Viewing the evidence in the light most favorable to McCaster, Nelson, 583 F.3d at 528, we agree with the district court that the record could support the finding that Clausen knew of McCaster's medical needs because they were obvious and because she had been alerted to his illness by inmates and correctional staff but that she failed to respond to them.

Julie Nelson and Patti Vodinelich also saw McCaster within two weeks of his hospital admission. Although their interactions with McCaster at the medicine call window were short, there is evidence that the nurses inspected his wristband with his intake photograph before disbursing his penicillin and that by this point he was "chronically sick looking" and much thinner than in the intake picture visible on his wrist. The record also includes evidence from which it can be inferred that Nelson

-11-

received at least one of the medical requests for McCaster signed by numerous inmates, but that she declined to respond because McCaster had not himself sought help. A correctional officer also testified that McCaster appeared so sick that she brought his condition to Vodinelich's attention. Such evidence would allow a factfinder to conclude that both Nelson and Vodinelich became aware of McCaster's obvious medical needs in their repeated brief interactions with him and through the efforts of inmates and prison officials who sought care for him. Nelson's lack of response to the medical request signed by others and Vodinelich's response to a correctional officer's request the very night McCaster was transferred to an emergency room also support a finding that they were deliberately indifferent to his serious medical need.

## IV.

For the foregoing reasons, we deny McCaster's motion to dismiss the appeal, reverse the denial of summary judgment to Nancy Mattson and Audrey Darling, affirm the district court's denial of summary judgment to Mary Clausen, Julie Nelson, and Patti Vodinelich, and remand to the district court for further proceedings.

BRIGHT, concurring in part and dissenting in part.

I concur with the majority's analysis that, at this stage of the proceedings, nurses Mary Clausen, Julie Nelson and Patti Vodinelich are not entitled to qualified immunity from McCaster's lawsuit. However, I decline to join in the majority's determination that nurses Nancy Mattson and Audrey Darling are entitled to qualified immunity, and would affirm the district court's denial of their motion for summary judgment.

The record makes out a case of deliberate indifference towards McCaster's serious medical need by all of the nurses. Given the evidence and testimony from the

Ramsey County Correctional Facility ("RCCF") staff, inmates, and various medical experts, a reasonable fact finder could conclude that all of the nurses, including Mattson and Darling, should have seen a gravely ill person, but each closed their eyes and mind to the obvious.

Although the case against Mattson and Darling does not have as much evidential support as compared to Clausen, Nelson and Vodinelich, there is, nonetheless, sufficient circumstantial evidence that Mattson and Darling should have recognized McCaster was in serious need of medical attention. The district court carefully examined the lengthy evidentiary record in which many of the salient facts were not in dispute. Viewing those facts in the light most favorable to McCaster, the district court observed that from the beginning, when McCaster arrived at the RCCF on April 17, Mattson and Darling could observe that McCaster was very sick:

> [E]ach saw him within two days of his arrival at the RCCF, when he was indisputably less symptomatic. Nevertheless, the Court finds that McCaster has proffered sufficient evidence to create a genuine issue whether he was "obviously" ill as of that time. At intake, he indicated that he had experienced recent weight loss, and Mattson noted that he was tachycardic. Logs of his telephone calls indicate that he was repeatedly coughing from the moment he arrived at the RCCF. Other inmates testified that he was "visually sick" and could barely walk from day one. Corrections officers . . . thought it was "obvious" something was wrong with McCaster when they first encountered him on April 19, two days after his admission. And Drs. Fithian and Reichman, both defense witnesses, testified that McCaster likely was experiencing active TB symptoms, including a productive cough, throughout his incarceration, as demonstrated by the fact that he had already infected his family members by the time he arrived at the RCCF. This evidence is sufficient to satisfy McCaster's burden of demonstrating a genuine issue for trial vis-à-vis Mattson and Darling.

-13-

(Appellant's Addendum 15-16.)  The majority does not contend that the above reference to the record is incorrect.

Based on the district court's careful analysis of the evidence, I would affirm the district court's denial of appellants' motion for summary judgment in all respects.

_____