# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 12-3536

———————————————

Eartha L. McMiller,

*Plaintiff - Appellant,*

v.

Metro,

*Defendant - Appellee.*

——————————

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

——————————

Submitted: May 17, 2013
Filed:December 26, 2013
[Published]

——————————

Before MURPHY, SMITH, and COLLOTON, Circuit Judges.

——————————

PER CURIAM.

Eartha McMiller sued the Bi-State Development Agency of the Missouri-Illinois Metropolitan District ("Metro"), her former employer, alleging that her supervisor had sexually harassed her in violation of Title VII. 42 U.S.C. § 2000e, *et seq.* The district court granted summary judgment in favor of Metro, and McMiller appeals. We affirm in part, reverse in part, and remand for further proceedings.

McMiller began work as the second shift supervisor of the parts storeroom at Metro's central repair facility on March 19, 2007. Metro hired McMiller after Louis Brown, a Metro employee whose wife was acquainted with McMiller, provided Metro with McMiller's resume. Brown instructed McMiller to add certain skills to her resume before submitting it, and also coached McMiller on the questions Metro used during interviews. McMiller asserts that Brown, her direct supervisor after she was hired, made sexual advances on three occasions and threatened to terminate her employment if she refused his demands.

The first incident of alleged harassment occurred in April 2007. Brown approached McMiller and asked her to walk with him through a storeroom. While in the storeroom, Brown put his arms around McMiller's shoulders and kissed the side of McMiller's face near her eyes. McMiller responded, "[D]on't do that, you better be careful of that type of behavior, I am not comfortable with that type of action from you."

The second incident followed in late May 2007. Brown entered McMiller's office and attempted to put his arm around McMiller's shoulder. McMiller "pushed him away very quickly" and said, "I have told you about this before, don't do that" and "you need to be careful." After the May 2007 incident, says McMiller, Brown's "entire demeanor" became "bias[ed] and angry," and McMiller "was not able to communicate with him about anything" concerning her job. McMiller states that Brown "told me not to try to go to anybody and talk to them about nothing, anything at all."

McMiller approached Kathy Hunt, Brown's direct supervisor, in July 2007. McMiller told Hunt that she "was being harassed in my job," and that Brown "was doing some improper things towards me" that were "not right as far as a manager to

supervisor or manager to worker." McMiller asked Hunt if she would be willing to meet and talk further, and Hunt replied that she would be in touch. McMiller and Hunt did not speak again about McMiller's allegations.

At some point the same month, Brown and Tony Miller, Metro's manager of production and inventory control, expressed concern to Hunt about McMiller's job performance. Brown and Miller told Hunt that McMiller arrived to work tardily, wore revealing clothing rather than the Metro uniform, and failed to complete her job duties promptly and accurately. In her deposition testimony, McMiller acknowledged making errors, but stated that Brown had never reprimanded her for tardiness and that she had begun wearing non-uniform clothing at his suggestion. Hunt instructed Brown to prepare and deliver to McMiller a written performance improvement plan documenting these issues and the consequences if McMiller failed to improve her performance. Brown prepared a written plan, which Hunt reviewed, and delivered it to McMiller on July 18, 2007. Brown gave McMiller a second memorandum regarding performance problems on July 20, 2007.

The third incident of alleged harassment occurred in July or August 2007. According to McMiller, Brown called her into his office and shut and locked the door. McMiller asked Brown whether he wanted to speak with her about the performance improvement plan, and Brown responded that he was waiting for a report about McMiller's job performance from a person whom he refused to name. Brown then told McMiller to "come over here" and remove an ingrown facial hair from his chin. McMiller refused, telling Brown that she already had warned him "to be careful of that type of behavior." Brown directed McMiller to remove the hair and placed a tweezer in her hand. McMiller protested that she was unable to see the hair. Brown told McMiller to look again and said, "you know I can terminate you."

McMiller became upset and moved toward the office door. As McMiller touched the doorknob, Brown placed his hand on her right wrist, removed her hand

from the door, turned her toward him, put his arms on her shoulders and neck, and kissed her on the side of her face and forehead. McMiller attempted to remove Brown's arms, but found that Brown had placed her "in a locked position." Brown told McMiller that he was "not going to let anything happen to you while you are on this job." McMiller replied that she was "not worried" because she felt she was learning and following instructions. The encounter ended.

Some time in late August 2007, Hunt met with Brown and Miller to discuss McMiller's performance. Based on comments from Brown and Miller, plus her own observations, Hunt directed Brown and Miller to terminate McMiller's employment. On August 28, Brown and Miller called McMiller into an office, and Miller informed McMiller that she was discharged. McMiller protested to Miller that Brown had been behaving in a way that was "not proper" and that she had "been trying to talk to somebody about Mr. Brown's behavior toward me in a wrongful way." Brown intervened, saying that the termination had "nothing to do" with McMiller's job performance, but rather with a complaint from a maintenance supervisor that she was not "a good fit for storeroom personnel." Miller informed McMiller that she could appeal her termination to the company's human resources department, and the conversation ended. Brown escorted McMiller to her car.

McMiller sued *pro se* on January 26, 2009, after receiving notice of a right to sue from the Equal Employment Opportunity Commission. She alleged employment discrimination on the basis of sex, in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, and on the basis of age, in violation of the Age Discrimination in Employment Act (ADEA). 29 U.S.C. § 621, *et seq*. Metro moved to dismiss the suit. The district court granted the motion in part, but declined to dismiss McMiller's sexual harassment claims.

Metro moved for summary judgment. The district court granted the motion, concluding that McMiller had failed to create a genuine issue of material fact as to

whether Brown had discriminated against her based on her sex and that the harassment she alleged was not so severe or pervasive as to create a hostile work environment. McMiller appealed. We determined that the district court's order was not a final judgment subject to appellate review, because the district court had discussed "only hostile-work-environment issues in its order," despite recognizing that McMiller also asserted a "quid-pro-quo" harassment claim.

The district court vacated its prior order, and Metro again moved for summary judgment on McMiller's Title VII claims. The district court granted the motion, concluding that McMiller had failed to show that she had been the target of harassment based on her sex. As a result, the district court ruled, she could not establish a sexual harassment claim. McMiller again appeals.

II.

McMiller challenges the district court's grant of summary judgment on her sexual harassment claims. She asserts that Brown subjected her to harassment based on her sex and that his actions both constructively and explicitly changed the terms or conditions of her employment. We review the district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to McMiller. *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 415-16 (8th Cir. 2010).

It is unlawful for an employer to discriminate against an employee with respect to the compensation, terms, conditions, or privileges of employment based on the employee's sex. 42 U.S.C. § 2000e-2(a). A plaintiff asserting a Title VII claim must show that "(1) she is a member of a protected group, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on sex, and (4) the harassment affected a term, condition, or privilege of her employment." *Alvarez*, 626 F.3d at 419. The case law makes a "rough demarcation" between cases in which an employer carries out a threat to alter terms or conditions of a plaintiff's employment

-5-

based on sex and those in which such threats are absent or not fulfilled. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751, 753-54 (1998). The term "hostile work environment" is sometimes used to describe a claim that an employer's harassment was so severe or pervasive as to alter effectively the conditions of the plaintiff's employment because of her sex. *See id.* at 753-54; *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). The term "*quid pro quo*" harassment is sometimes used to describe a claim that an employer demanded sexual favors in exchange for job benefits and took tangible action against the plaintiff when she refused to acquiesce. *See Ellerth*, 524 U.S. at 753-54. McMiller alleges both forms of discrimination here.

McMiller first contends that Brown's behavior resulted in a hostile work environment that amounted to constructive sex discrimination. She asserts that Brown kissed her face on two occasions, placed his arms around her or attempted to do so three times, and requested that she remove an ingrown hair from an area near his chin. We agree with the district court, however, that the evidence presented in this case, while demonstrating conduct that "can at best be described as inappropriate," is insufficient to establish severe or pervasive harassment under our precedents.

Four decisions help to illustrate the boundaries of a hostile work environment claim under circuit precedent. In *Duncan v. General Motors Corp.*, 300 F.3d 928 (8th Cir. 2002), the court determined that a plaintiff had not proved a hostile work environment with evidence that a supervisor sexually propositioned her, repeatedly touched her hand, requested that she draw an image of a phallic object to demonstrate her qualification for a position, displayed a poster portraying the plaintiff as "the president and CEO of the Man Hater's Club of America," and asked her to type a copy of a "He–Men Women Hater's Club" manifesto. *Id.* at 931-35. In *Anderson v. Family Dollar Stores of Arkansas, Inc.*, 579 F.3d 858 (8th Cir. 2009), where a supervisor had rubbed an employee's back and shoulders, called her "baby doll," "accus[ed] her of not wanting to be 'one of [his] girls,'" suggested once in a long-

distance phone call "that she should be in bed with him," and "insinuat[ed] that she could go farther in the company if she got along with him," this court ruled that the evidence was insufficient to establish a hostile work environment. *Id.* at 862. And in *LeGrand v. Area Resources for Community and Human Services*, 394 F.3d 1098 (8th Cir. 2005), the court ruled that a plaintiff who asserted that a harasser asked him to watch pornographic movies and to masturbate together, suggested that the plaintiff would advance professionally if the plaintiff caused the harasser to orgasm, kissed the plaintiff on the mouth, "grabbed" the plaintiff's buttocks, "brush[ed]" the plaintiff's groin, "reached for" the plaintiff's genitals, and "briefly gripped" the plaintiff's thigh, had not established actionable harassment. *Id.* at 1100-03. Even *Rorie v. United Parcel Service, Inc.*, 151 F.3d 757 (8th Cir. 1998), which this court described as a "borderline" case for submission to a jury, *id.* at 762, involved harassment of greater frequency and duration than the three incidents alleged by McMiller. The plaintiff in *Rorie* testified that her supervisor asked her about a coworker's penis size, told her that she looked better than other women in her uniform, and "throughout" three years of employment "often" told her that she smelled good, patted her on the back, and brushed up against her. *Id.* at 761.

In light of these precedents, Brown's alleged conduct was not so severe or pervasive as to alter the terms and conditions of McMiller's employment. We therefore affirm the district court's grant of summary judgment on this claim.

McMiller also contends that Brown implicitly demanded sexual favors in exchange for influencing Metro to continue McMiller's employment, and that she was terminated because she refused to cooperate with Brown's attempts to engage her sexually. The district court ruled that Brown's alleged *quid pro quo* harassment was not "based on sex," and Metro argues that the incident involving Brown's ingrown hair was asexual.

We conclude that McMiller's evidence is sufficient to generate a genuine issue of fact for trial on this theory. A reasonable jury could conclude that Brown made a strange request for grooming assistance in an effort to bring McMiller into close physical proximity and to gratify himself sexually in exchange for protecting her job. During the encounter, after McMiller balked at removing the ingrown hair, Brown allegedly reminded McMiller that he could prevent her from being terminated, placed her in a locked position in which he kissed and touched McMiller, and assured McMiller that he would not let anything happen to her while she was on this job. Before that date, Brown already had kissed and touched or attempted unsuccessfully to touch McMiller and reacted angrily when rebuffed.

A reasonable jury also could infer a causal relationship between McMiller's refusal to indulge Brown and her termination. Although it was Hunt who ultimately determined that McMiller would be fired, Hunt acknowledged that she relied on Brown's comments, in addition to her own observations, when deciding McMiller's future at the company. To be sure, there was evidence that the employer was motivated by McMiller's poor work performance, and the employer is entitled to press that explanation before a jury, but McMiller has generated genuine issues of fact as to whether Brown was motivated by sex and whether he intentionally and proximately caused her termination through influence on Hunt. *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011); *see also Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551 (8th Cir. 2013). We therefore reverse the district court's grant of summary judgment on this claim.

*       *       *

The judgment of the district court is affirmed in part, reversed in part, and the case is remanded for further proceedings consistent with this opinion.

MURPHY, Circuit Judge, concurring in part and dissenting in part.

I concur with the panel's conclusion that McMiller has presented a triable issue as to whether she was subjected to quid pro quo harassment, but I respectfully dissent from its conclusion that she has not shown a triable issue as to whether she was also subjected to a hostile work environment.

Title VII has long been recognized to be violated by conduct severe or pervasive enough to create an objectively hostile work environment. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). The Supreme Court has explained that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." Id. at 23. Such circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," and the effect on the employee. Id. The Court in Harris held that while numerous factors may be taken into account, "no single factor is required." Id.

The record facts of the present case have created a triable issue as to whether McMiller was subjected to a hostile work environment. McMiller has alleged repeated instances of physical harassment by her direct supervisor spanning the entire term of her brief five months of employment. McMiller testified that supervisor Brown called her into his office one day and told her to lock the door behind her, then asked her to remove an ingrown hair from his chin. When she hesitated he threatened her employment and prevented her from leaving the room by placing his arms around her "in a locked position." Multiple unwanted kisses on the face followed. Moreover, the same supervisor had made prior unwelcome sexual advances by touching and kissing McMiller during her first week of employment. Although she rebuked him and told him his actions made her uncomfortable, McMiller testified that

on a third occasion Brown attempted to embrace her again and she was required to fend him off. She repeated her verbal objections to this conduct.

These acts were not ordinary harassment allegations. They rose above the level of "mere offensive utterance" to sexual physical advances that were not only unwelcome, but humiliating. See Harris, 510 U.S. at 23. McMiller communicated her lack of consent to being touched and kissed by Brown during her first week of work. It is especially significant that these advances came from her direct supervisor, for "acts of supervisors have greater power to alter the environment than acts of coemployees generally." Faragher v. City of Boca Raton, 524 U.S. 775, 805 (1998).

I disagree with the panel conclusion that the harassment in this case is less severe than in Rorie v. United Parcel Service, Inc., 151 F.3d 757 (8th Cir. 1998). There, in considering the severity of harassment within 180 days of the plaintiff's filing her EEOC complaint, our court stated that "we cannot say that a supervisor who pats a female employee on the back, brushes up against her, and tells her she smells good does not constitute sexual harassment as a matter of law." Id. at 762. On this basis we reversed a grant of summary judgment in favor of the employer. Id. Additional facts cited today by the panel fell outside the 180 day period (comments about a coworker's penis size and the compliments expressed). Id. at 761–62. Our court considered these comments only to the extent they "suggest that his later behavior presents a jury question," id. at 762, not because they themselves presented one.

I submit that being embraced and kissed by a supervisor both before and after vocally objecting to such advances, being subjected to an intimate request for personal body grooming that requires close bodily proximity, and being physically prevented from leaving a room by being held in place and kissed are at least as severe as being patted on the back, brushed up against, and complimented by a supervisor. See id. at 762.

-10-

The facts of any alleged harassment should first and lastly be considered on their own merit without comparing them line by line to a summation of facts in some other case which the court has or has not considered to be triable. None of the other cases cited by the panel here would preclude a finding that McMiller was subjected to a severe hostile work environment. Circumstances which increase the severity here were not present in those cases. In <u>Duncan v. General Motors Corp.</u>, 300 F.3d 928, 931 (8th Cir. 2002), excepting "four or five occasions when [the alleged harasser] would unnecessarily touch" the plaintiff's hand while handing off the telephone, there was no allegation of any physical harassment. Similarly, in <u>Anderson v. Family Dollar Stores of Arkansas, Inc.</u>, 579 F.3d 858, 862 (8th Cir. 2009) the only physical conduct alleged was the harasser rubbing the plaintiff's back and shoulders. The touching and kissing in this case are undeniably more intimate and severe than the physical conduct of those cases.

Moreover, it is undisputed here that Brown was McMiller's direct supervisor, a factor not present in <u>LeGrand v. Area Resources for Community and Human Services</u>, 394 F.3d 1098, 1101 (8th Cir. 2005). In light of the relative power positions present in the workplace, it is not surprising that the Supreme Court has assigned greater significance to the actions of supervisors than coemployees generally. <u>See</u> <u>Faragher</u>, 524 U.S. at 805.

The Supreme Court has made clear that in every case we must examine all the circumstances and that no single factor must be shown. <u>Harris</u>, 510 U.S. at 23. All that is required is that harassing conduct be severe or pervasive enough to alter the conditions of employment and create a hostile work environment. <u>Id.</u> at 21. The repeated and physical nature of the supervisor's conduct here, spanning from the first week to the last month of McMiller's employment, make the harassment in this case severe enough to create a triable issue as to whether she was subjected to a hostile work environment. The district court's grant of summary judgment on McMiller's

-11-

harassment claim should therefore be reversed and remanded for trial.

_____