# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3273

_____

Stephanie Jenkins

*Plaintiff - Appellee*

v.

The University of Minnesota

*Defendant*

Ted Swem, in his personal capacity

*Defendant - Appellant*

David E. Andersen, in his personal capacity

*Defendant*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: June 15, 2016
Filed: October 3, 2016

_____

Before MURPHY and SHEPHERD, Circuit Judges, and PERRY,[1] District Judge.

_____

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri, sitting by designation.

PERRY, District Judge.

Stephanie Jenkins brought this sexual harrassment suit under 42 U.S.C. § 1983 against the University of Minnesota, David Andersen, and Ted Swem. After the district court denied Swem's motion for summary judgment based on qualified immunity, he appealed. This Court has jurisdiction over this interlocutory appeal. We affirm the district court's[1] denial of qualified immunity.

## I. Background

Stephanie Jenkins entered the University of Minnesota in the fall of 2011 to pursue a Ph.D. in Natural Resources and Science Management.[2] The summer before she began her studies, Jenkins was offered a unique and professionally advantageous opportunity to work as a graduate researcher collecting field data on peregrine falcons on the Colville River in Alaska. The project, a joint collaboration between the U.S. Geological Survey, the Bureau of Land Management, and the University, aligned with her exact academic interests.

Ted Swem, a scientist from the United States Fish and Wildlife Services stationed in Fairbanks, Alaska, is the leading authority in the field of peregrine falcons. He has been monitoring the birds in Northern Alaska for approximately thirty years. Swem's role in the project was to be mentor and guide to Jenkins, teaching her how to collect and sort the data, as well as how to survive in the remote region.

---

[1] The Honorable John R. Tunheim, Chief Judge, United States District Court for the District of Minnesota.

[2] For the purposes of this appeal, we take as true those facts the district court found or likely assumed as true – so long as they are not blatantly contradicted by the record – and make all reasonable inferences in favor of the plaintiff regarding any unresolved factual questions. *Brown v. Fortner*, 518 F.3d 552, 557-58 (8th Cir. 2008).

In June and July of 2011, Jenkins and Swem embarked on two 17-day research trips to the isolated Colville River, a remote field location in arctic Alaska almost completely uninhabited by humans. Almost immediately, Swem began telling sexually explicit jokes, asking Jenkins personal questions about her dating life, and telling stories of prior sexual encounters and relationships with previous graduate students. He took a photograph of her buttocks, which he later deleted, and made a comment about "the scenery." He bathed in the river in front of her, and encouraged her to do the same, telling her she was too modest. He also made reference to her needing a "pool boy" to accompany her on research trips.

Between and after the trips, Jenkins stayed in Fairbanks for a couple of weeks to organize and analyze the collected data. In Fairbanks between the two trips, Swem invited Jenkins on social outings, including offering to take her rappelling and kestrel banding, because she would need those skills on her second trip. On the day of this particular outing, and once they were fairly far outside of Fairbanks, Swem claimed he forgot the rappelling equipment. Instead they banded kestrels and had dinner together at a restaurant. He offered to be her pool boy and give her a "horse bite" while they were in the car together. When they arrived back at his house later that evening, Jenkins went inside to retrieve her computer. Swem left the lights off in the house and stared at her.

Another time, Swem invited Jenkins to lunch under the pretense of discussing logistics of the upcoming trip, even though it quickly became apparent that the trip was already planned. He complimented her physical appearance and told her he was interested in a romantic relationship with her. He joked that they should bring only one tent for the next trip and that she was welcome in his tent anytime. He also told her that she could just sit in his lap and kiss him if she ever wanted a relationship with him. He acknowledged that his behavior could be construed as sexual harassment because of the power dynamic, but suggested that his role could be changed if she

-3-

was interested in pursuing a relationship. Jenkins informed Swem that she wished to keep their relationship professional.

During the second trip, Dr. Andersen – Jenkins' academic advisor at UM and a collaborator on the research project – was present for the first seven days of the trip. Swem did not tell any sexual jokes or otherwise act inappropriately during that time, but as soon as Andersen left, Swem resumed his aggressive sexual advances. On one occasion, as they rappelled down to a nest site, Swem described what he thought it would be like to kiss her. Jenkins could not physically distance herself from him at this point, so she did not respond at all. Swem also brought alcohol on the trip and encouraged Jenkins to drink every night. He suggested they celebrate their last night of the trip by finishing an entire bottle of whiskey together, but Jenkins declined.

Swem continued to pressure Jenkins on the question of why she wasn't interested in a romantic relationship. She repeated that they worked together and offered several other reasons as well.

When they returned to Fairbanks after the second trip, Swem invited Jenkins to dinner at his house on multiple occasions, always offering her alcohol. She also went there on occasion to shower, and to use his laundry facilities, because she did not have running water in her cabin. Swem continued to discuss his desire for a relationship with her, explaining that all the reasons she gave for not dating him were logistical and could be overcome. Jenkins again explained that she had no interest in a romantic relationship with him.

When she arrived at UM for the beginning of the fall semester, Jenkins learned that she and Swem were assigned to share an office space. He was to be there for one academic year, analyzing his Colville river data, among other duties. Swem continued to invite Jenkins out on social outings, including dinner and hockey games, though he did not make any further sexual comments. Jenkins eventually started

studying and doing her graduate work in coffee shops or libraries to avoid Swem. She states that he was "always" in their shared office with the door closed. After failing a statistics exam, Jenkins sought counseling.

The counselor suggested that she was suffering from anxiety and stress related to the situation with Swem, and that she should talk to her advisor about relocating to a new office. On Friday, November 4, 2011, Jenkins discussed Swem's behavior with Dr. Andersen for the first time. Andersen made a new office space available to Jenkins the following Monday, but it took some time to arrange for internet access in the new space, meaning it was not immediately useful. In January of 2012, Jenkins resigned from the University. She has since been diagnosed with PTSD, depression, and anxiety.

Jenkins brought suit against UM, Dr. Andersen, and Swem, alleging that Swem sexually harassed her and created a hostile work environment in violation of her Fourteenth Amendment rights. Swem filed a motion to dismiss the claim against him in his individual capacity, arguing that he was entitled to qualified immunity, which the district court denied. Swem later moved for summary judgment on the same grounds, and the district court again denied the motion. The court concluded that Jenkins' constitutional right to be free from sexual harassment by a state actor was clearly established under the Fourteenth Amendment. Next, the district court concluded that genuine questions of material fact existed as to whether Swem violated Jenkins' constitutional rights, including: whether Swem's conduct was unwelcome and whether Jenkins made that fact known; whether Swem was able to take action that affected a term, condition or privilege of Jenkins' employment; and, whether Swem's behavior interfered with Jenkins' performance on the job. The district court concluded that the facts, when construed in the light most favorable to Jenkins, demonstrated a constitutional violation and so the Court denied qualified immunity. This interlocutory appeal followed.

## II. Analysis

On appeal, Swem argues that he was entitled to qualified immunity, and the district court should have granted him summary judgment on Jenkins' hostile work environment claim. As an initial matter, we must address whether this Court has jurisdiction over Swem's interlocutory appeal. If we find jurisdiction is proper, we will then discuss whether Swem possessed qualified immunity.

## A. Jurisdiction

Ordinarily, this Court lacks jurisdiction to "hear an immediate appeal from a district court's order denying summary judgment, because such an order is not a final decision." *Shannon v. Koehler,* 616 F.3d 855, 860 (8th Cir. 2010) (quoting *Langford v. Norris,* 614 F.3d 445, 455 (8th Cir. 2010)). We have limited authority to review the denial of qualified immunity through an interlocutory appeal under the collateral order doctrine. *Id*. at 861. Jurisdiction over an interlocutory appeal from the denial of qualified immunity extends only to "abstract issues of law," not to "determinations that the evidence is sufficient to permit a particular finding of fact after trial." *Id*. (quoting *Krout v. Goemmer,* 583 F.3d 557, 564 (8th Cir. 2009)). When an appellant challenges issues of fact, we apply de novo review, but "must take as true those facts the district court found or likely assumed as true," so long as they are not blatantly contradicted by the record. *Williams v. Herron*, 687 F.3d 971, 974 (8th Cir. 2012). "As to any unresolved factual questions, we make all reasonable inferences in favor of the plaintiff." *Id*. *(*citing *Brown v. Fortner,* 518 F.3d 552, 558 (8th Cir. 2008)).

Although Jenkins argues that we do not have jurisdiction to review the claims raised in this interlocutory appeal because they are fact-based, not every denial of summary judgment is nonappealable simply because it includes a determination that there are controverted issues of material fact. *Shannon,* 616 F.3d at 861 (citing *Behrens v. Pelletier*, 516 U.S. 299, 312-13 (1996)). Jurisdiction extends to the

"purely legal" issue of whether the facts, taken most favorably to the plaintiff, support a finding that the defendant violated her clearly established constitutional rights. *Reeves v. King,* 774 F.3d 430, 431 (8th Cir. 2014). We may properly review this appeal under these standards.

## B. Qualified Immunity

"'Qualified immunity protects government officials performing discretionary functions from liability for damages so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Curry v. Crist,* 226 F.3d 974, 977 (8th Cir. 2000) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

When considering qualified immunity, we must answer a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Santiago v. Blair,* 707 F.3d 984, 989 (8th Cir. 2013). Defendants "are entitled to qualified immunity unless the answer to both of these questions is yes." *McCaster v. Clausen,* 684 F.3d 740, 746 (8th Cir. 2012). We review a district court's qualified immunity determination on summary judgment de novo, viewing the record in the light most favorable to the plaintiff and drawing all reasonable inferences in her favor. *Shannon,* 616 F.3d at 861-62.

### 1. Did Swem Violate a Constitutional Right?

Sexual harassment by state actors violates the Fourteenth Amendment and can form the basis for a §1983 action. *Wright v. Rolette Cty.*, 417 F.3d 879, 884 (8th Cir. 2005) (citing *Tuggle v. Mangan,* 348 F.3d 714, 720 (8th Cir. 2003)). To establish a prima facie case of sexual harassment, Jenkins must show: 1) that she was a member of a protected group; 2) she was subjected to unwelcome sexual harassment; 3) the

harassment was based on her gender; and 4) that the harassment affected a term, condition, or privilege of employment. *Herron*, 687 F.3d at 975. "'To be actionable, harassment must be both objectively and subjectively offensive, such that a reasonable person would consider it to be hostile or abusive . . . .'" *Id.* (quoting *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004)). On appeal, Swem challenges the second and fourth elements of the claim.

As to the second element, harassing conduct is considered unwelcome if it was "uninvited and offensive." *Quick v. Donaldson*, 90 F.3d 1372, 1378 (8th Cir. 1996). The proper inquiry is whether the plaintiff indicated by her conduct that the alleged harassment was unwelcome. *Id. (*citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986)). Swem relies on the fact that Jenkins did not immediately report his conduct to demonstrate that it was not unwelcome. We are not persuaded that this fact precludes Jenkins' claim. Here, Jenkins told Swem multiple times during, between, and after the trips, that she was not interested in him romantically. She gave Swem several different explanations when pressed, including that he was a supervisor and colleague, and that he was much older than her. She also did not respond to his many advances. She never took him up on his offer to "sit in his lap and kiss him," never entered his tent, and did not kiss him when they were rappelling. Swem also admits that he "apologized if his expressing interest in Jenkins made her uncomfortable." This suggests that he was aware that Jenkins found his advances unwelcome.

Swem cites *Hocevar v. Purdue Frederick Co.,* 223 F.3d 721, 736 (8th Cir. 2000) to support his argument that Jenkins did not indicate by her conduct that Swem's actions were unwelcome. In *Hocevar*, the Court found the plaintiff had not demonstrated that the defendant's use of offensive language was unwelcome because the plaintiff admitted to using the very same language herself. *Id.* at 737. There is no analogy to the present case, where Jenkins did nothing to reciprocate Swem's expressed sexual and romantic interest in her. We conclude that Jenkins presented

sufficient evidence to show that she adequately communicated to Swem that his conduct was unwelcome.

As to the fourth element, Jenkins must show that Swem's conduct was "severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive . . . ." *Harris v. Forklift,* 510 U.S. 17, 21 (1993). Likewise, the victim must subjectively perceive the environment to be abusive. *Id.* Whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. *Id.* at 23. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.*; *see also*, *Wright*, 417 F.3d at 885. Whether the conduct caused economic injury or affected the plaintiff's psychological well-being may also be considered. *See Quick*, 90 F.3d at 1379.

Looking to the totality of the circumstances, we believe Jenkins showed she considered Swem's conduct to be "severe enough to alter the terms, conditions, or privileges of her employment, and that a reasonable person would consider it the same." *Herron*, 687 F.3d at 976. Here, the geographic isolation of the conduct is of paramount importance. Actions that might not rise to the level of severe or pervasive in an office setting take on a different character when the two people involved are stuck together for twenty-four hours a day with no other people – or means of escape – for miles around. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 82 (1998) ("Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive."). Swem made repeated advances, including jokes, comments, innuendos, and suggestions of contact throughout the duration of their association in Alaska, when

Jenkins was isolated and reliant upon Swem not only for academic instruction, but also for survival in a remote location.

Swem cites to several cases wherein we did not find the conduct rose to the level of "severe or pervasive," and argues that the conduct there was far worse than his own. *See,* e.g., *Rester v. Stephens Media, LLC,* 739 F.3d 1127, 1131 (8th Cir. 2014) (confrontation with a supervisor over a workplace disagreement not actionable because it did not denote a sexist connotation); *McMiller v. Metro,* 738 F.3d 185, 188 (8th Cir. 2013) (no hostile work environment found where defendant kissed plaintiff's face twice, placed his arms around her, and requested that she remove an ingrown hair from his chin). These cases are easily distinguishable based on the location of the harassing conduct (an office or traditional workplace setting), which is unlike the geographically isolated setting in which Swem's harassing conduct occurred. As the facts before the district court established, Swem and Jenkins were dropped by plane in an extremely remote region. They slept in tents with a shotgun close at hand, to protect themselves from bears. Jenkins, who had never been to the region before, was dependent on Swem for her survival in the harsh Alaskan conditions. She had no reasonable way to physically distance herself from Swem for the length of the trips, during which he kept up a continuous stream of unwanted harassing conduct.

Not only was Swem an expert in the necessary skills for navigating a journey along the river, he was also the premiere expert in the area of study that Jenkins' hoped to pursue. Just as her physical well-being was dependent upon Swem, her academic future was dependent upon him as well. Her Ph.D. research was to analyze and build upon the data he had collected for the past thirty years. Swem was there to teach her how to track, find, and record nest sites, band the birds for later tracking, and other vital skills. If she chose to call for a plane to leave the site early, or refused to go on the second excursion, she would have been forfeiting her research pursuits. She could not go alone, and she could not stay behind.

Jenkins also suffered psychological harm, in the form of post-traumatic stress disorder, depression, and anxiety. She failed an exam and fell behind in her research and dissertation goals. Finally, she resigned her position at the university as a result of these events, losing the opportunity to obtain her Ph.D., which inevitably affects her economic prospects.

Under these circumstances, Jenkins has provided evidence that Swem's conduct was sufficiently frequent, severe, and an unreasonable interference with her work performance. She also provided evidence that she suffered psychological and economic injury. Therefore, Jenkins has sufficiently shown the fourth element of her hostile-work-environment claim.

### 2. Was the Right Swem Violated Clearly Established?

The second prong of the qualified immunity analysis requires us to determine whether the right that Swem allegedly violated was "clearly established" at the time of the challenged conduct. Whether an official eligible for qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quoting *Harlow,* 457 U.S. at 819), assessed in light of the legal rules that were "clearly established" at the time it was taken. *Id.* To be clearly established, the contours of the right must be sufficiently clear such that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson*, 483 U.S. at 640). Existing precedent must have placed the statutory or constitutional question beyond debate. *Id.* "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Nord v. Walsh Cnty.*, 757 F.3d 734, 739 (8th Cir. 2014) (quoting *Anderson,* 483 U.S. at 640).

Swem does not dispute that the right to be free of sexual harassment in the workplace is clearly established, but asks us to take a very narrow view of the contours of that right here. He insists that a reasonable public official would not have known that his comments, "void of any physical conduct," could amount to sexual harassment. We find this argument unavailing. Our case law clearly establishes that physical contact is not required to make out a hostile-work-environment claim. *See Wright,* 417 F.3d at 885 (8th Cir. 2005)("verbal harassment of a sexual nature which creates an offensive working environment fits the regulation's definition of sexual harassment"); *Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 964 (8th Cir. 1993) (sexual harassment "can obviously result from conduct other than sexual advances" and the employee need not be "touched offensively") (citation omitted); *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1267 (8th Cir. 1997) (summary judgment for employer reversed when plaintiff pled harasser made sexist comments on marriage, pregnancy, and plaintiff's appearance, and called her a "babe," but alleged no physical conduct nor sexual advances). We find that the right Swem violated was clearly established.

Swem then argues that a reasonable official in his position would not have known the conduct was unlawful because he did not receive any sexual harassment training from UM and lacked specific knowledge of UM's sexual harassment policy. "A reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818-19. A person such as Swem, who has had prior experience working with and supervising students, should be aware that sexual harassment violates a student's clearly established rights, even in the absence of specific training.

-12-

### 3. Swem Was Not Entitled to Qualified Immunity

Because we find that Jenkins has satisfied both prongs of the qualified immunity analysis, we agree with the district court that Swem was not entitled to qualified immunity or summary judgment on that basis.

### C. Color of State Law

Swem finally argues that, because any pursuit of a relationship with Jenkins was "purely personal" he was not acting under of color of state law, and therefore the case is not actionable. Swem urges that we have pendent jurisdiction to consider this issue is because it is coterminous with the qualified immunity analysis. We disagree.

We have held that we may only exercise pendent jurisdiction where the issue is "inextricably intertwined" with a properly presented issue such that "appellate resolution of the collateral appeal necessarily resolves the pendent claim as well." *See Kincaide v. City of Blue Springs, Missouri*, 64 F.3d 389, 394 (8th Cir. 1995). It is true that, to find Swem is entitled to qualified immunity, we would necessarily have to decide that he was acting within his capacity as a government official. *See Edwards v. Baer,* 863 F.2d 606, 607 (8th Cir. 1988) (qualified immunity protects government officials "who make a reasonable mistake in the exercise of his official duties."). However, we need not reach this issue. Where, as here, a defendant fails to establish that he did not violate a right or that the right in question was not clearly established, then he is not entitled to qualified immunity, regardless of whether he acted under color of state law. Accordingly, we find that this question is not coterminous with the issue properly on appeal, and we have no jurisdiction to consider it.

### III. Conclusion

We agree with the district court that Swem is not entitled to qualified immunity and that summary judgment should be denied. Although disputes of facts remain, when the facts relied on by the district court are considered in the light most favorable to Jenkins, she sufficiently showed that Swem's conduct toward her was unwelcome harassment, and that it was serious enough to alter a term or condition of her employment. She also showed that Swem's conduct violated a clearly established right, based on the particular facts of this case. Accordingly, we affirm.

_____