# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3100

_____

Bobbette M. Blake

*Plaintiff - Appellant*

v.

MJ Optical, Inc., a Nebraska corporation

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 10, 2017
Filed: August 31, 2017

_____

Before RILEY, BEAM, and SHEPHERD, Circuit Judges.

_____

RILEY, Circuit Judge.

Bobbette Blake sued her former employer, MJ Optical, Inc., alleging she was the victim of sex discrimination, age discrimination, and a hostile work environment. The district court[1] granted MJ Optical's motion for summary judgment, finding

_____

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

Blake's evidence insufficient to support her federal and state law claims. Blake appeals, and we affirm. See 28 U.S.C. § 1291.

## I.    BACKGROUND

This case involves Blake's relationships with MJ Optical and the Hagge family, both of which began over forty years ago. Blake started working at a company called Shamrock in the early 1970s. Shamrock's owner, Michael Hagge, would sometimes bring his then-adolescent son, Marty Hagge, to help around the shop. It is not entirely clear in the record, but at some point the Hagges went from owning Shamrock to MJ Optical and Blake followed them there. For decades Blake worked as a bench technician in the finishing department—fitting eyeglass lenses into frames—for Shamrock, and then MJ Optical.[2]

At some point before 1993, Marty became Vice President of MJ Optical. Marty was one step removed from being Blake's direct supervisor, but "[h]e supervised the whole shop" and Blake interacted with him every day. Blake maintains they had a purely "[e]mployer/employee relationship," albeit one that sometimes extended beyond work. For instance, Marty invited Blake to his daughter's wedding, and Blake attended; Marty enrolled in a few college courses with Blake's grandson, and at least once helped the grandson with class work; and Marty lent Blake's church a hog cooker, prompting Blake to introduce him to her pastor. These anecdotes are illustrative of what Blake admits was a "good" relationship with Marty for a majority of her employment.

Blake claims that all changed at her husband's funeral in 1999. Marty attended the funeral, as did his father and several other MJ Optical employees. Blake says she was standing outside the funeral home when Marty walked by and "grabbed [her]

---

[2]Blake worked for the Hagges' Omaha-based businesses continuously from the early 1970s to May 2013, except for a two-year hiatus in the early 1990s.

fanny." When Blake asked "What was that all about?" Marty replied, "I thought you needed it." That was the entirety of the exchange.

However that was not the end of the conduct Blake now cites as the basis for this action. From that point onward, Marty would occasionally touch Blake's buttocks at "[v]arious times during the workday." According to Blake, Marty "would either smack it really hard or grab [her] whole cheek of [her] butt. I mean, it was no love pat." Blake flashed "a dirty look" at least once in response to the touching, but she never verbalized her complaint to Marty or anyone else given her belief it "[w]ouldn't have done any good." Marty also began telling Blake she "needed to find a man," which Blake took to mean "that if [she] had sex with a man, that it would make [her] happy."[3] Again, any frustrations Blake had about these recurring comments were not communicated to Marty or anyone else. Blake also recalls one exchange where she was standing in front of Marty's desk when he commented on her breasts, saying "you'd better watch those things because they're going to poke my eyes out" and asking whether her nipples were "the size of nick[el]s or quarters." "[E]mbarrassed" by the interaction, Blake says she "probably turned red" and "went home and bought padded underclothes."

Blake found herself on the receiving end of what she perceived to be age-related affronts, too.[4] For instance, Marty would tell Blake he "only kept her around to 'watch her die,'" even when other MJ Optical employees were present and could

_____

[3]Marty admits he "would pat [Blake] on the bottom and tell her that she needed to find a man." To Marty, his poor behavior was an "attempt to make [Blake] happy, to lighten her mood a bit." Marty also claims Blake "would likewise pat [him] on the bottom," a disputed issue of fact we must ignore at the summary-judgment stage. See Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

[4]Blake was born in 1949, meaning she was in her 50s and 60s when the complained-of conduct took place. She was the oldest employee in the nine-person finishing department, but not the oldest employee at MJ Optical.

hear. Blake acknowledges the comments were occasionally prompted by her asking Marty why he kept her around and were "[s]ometimes" meant as a joke. Marty would also tell Blake her "hands aren't any good anymore" whenever she needed his assistance fitting lenses into difficult frame styles. Yet again, Blake never informed Marty that she did not find the comments funny, nor did she complain to anyone else.

Notwithstanding all of the above, Blake admits she would platonically touch Marty "between his shoulders" and joke around with Marty "[o]n occasion." Sometimes Marty said, "I love you, Bobbi," to which Blake would respond, "I love you, too, Marty." Furthermore, when asked during a deposition whether she ever thought Marty "was treating [her] differently because of [her] gender," Blake replied, "No." Other than the comments above, the only time Blake felt treated differently due to her age was when Marty told her she was "too old" to carry stacks of trays, a limitation she says was unwarranted but one that "[d]idn't matter" to her.

The chain of events that ultimately led to Blake leaving MJ Optical began on May 9, 2013, when she noticed a problem with a large number of frames. Blake reported the issue to Mary Hagge—the president of MJ Optical and Marty's mother—who then tasked Marty with finding and fixing the problem. After Marty determined there was nothing wrong with the tracing machine, he turned his focus to Blake's work in the "mounting area." In an attempt to "diagnose" the problem, Marty "temporarily asked [Blake] to refrain from completing her mounting work" while two other long-term employees took over for a few days to see if the problem was manual or mechanical. Blake kept busy with other work, did not consider this short-term reassignment to be a demotion, continued at the same pay rate, was not worried she would be fired, and did not complain in any way.

Nonetheless—and despite explicit instructions to the contrary—Blake resumed her spot at the mounting station two or three days later when she noticed it was unoccupied. As Blake tells it, she was about to start when Marty noticed her from the

-4-

front of the shop and came at her "like a bull moose. He was red in the face, chomping his tongue like he does when he gets angry." Then Marty said, "I don't want you doing that, sit down. Let somebody else do it." Marty also accused Blake of being the reason he had to quit school and stay put at MJ Optical, an accusation Blake says Marty would sometimes make to all employees out of bitterness for his own situation. This was not the first time Marty had exhibited his angry demeanor in the workplace, so Blake feared he may become physically aggressive.[5]

After the encounter Blake was "shaking and crying" so much she "couldn't hardly function." Blake sought out Mary and described Marty's outburst, noting how upset it made her. Mary dismissed the notion Marty would have ever hit Blake—he "wouldn't do something like that"—but said she would talk to Marty about his anger problem. Despite finally registering a complaint against Marty, Blake did not mention any mistreatment based on her sex or age. (Blake did take this opportunity to air her grievances against her direct supervisor for unrelated reasons.) The conversation ended with Mary telling Blake to "go home and plant flowers." Blake did just that and took the afternoon off (with pay).

Rather than return the next day, Blake resigned from MJ Optical by leaving a voicemail for Mary. Blake again told Mary she was afraid of Marty's "noncontrollable" anger, and also expressed her gratitude to Mary for being a good boss. There is no evidence of any communication between Blake and anyone at MJ Optical between the day Blake quit and the day she filed her discrimination charge. Blake has since elaborated on the reasons she felt "compelled to resign." In addition to Marty's anger, the driving force behind Blake's decision seems to have been the problem with the ruined frames "and the way the work was coming out." Blake

---

[5]None of the three prior outbursts Blake recounted in her deposition (1) directly involved her, (2) resulted in Marty striking an employee, or (3) linked Marty's anger to sex- or age-based animus. To Blake, this final outburst "was the topper."

believed the issue "was never going to get fixed," meaning she would never return to her old duties because Marty "thought that [she] was the problem."[6] Blake also felt like she had no choice but to resign because she was "close to retirement age" and sensed MJ Optical was "weeding out" expensive, older employees in favor of a cheaper, younger work force. Notably, Blake testified her decision had nothing to do with any of Marty's sexual or age-related conduct. She also had no idea how her pay compared to younger employees' rates.

In October 2014, Blake sued MJ Optical in federal court for sex and age discrimination in violation of federal and state law.[7] See Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq.; Nebraska Fair Employment Practice Act, Neb. Rev. Stat. §§ 48-1101, et seq.; Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, et seq.; Nebraska Age Discrimination in Employment Act, Neb. Rev. Stat. §§ 48-1001, et seq. MJ Optical moved for summary judgment about one year later. See Fed. R. Civ. P. 56. Despite noting Marty's behavior was "without a doubt disgusting," the district court granted MJ Optical's motion and dismissed Blake's claims with prejudice.[8] We must now determine whether that decision was the right one.

---

[6]As it turned out, it appears Blake was not the root of the frame-assembly problem.

[7]The state acts are patterned after federal law, and given that neither party points to any differences between them, our analyses of Blake's federal claims apply with equal force to Blake's state claims. See Hartley v. Metro. Utils. Dist. of Omaha, 885 N.W.2d 675, 692 (Neb. 2016); Billingsley v. BFM Liquor Mgmt., Inc., 645 N.W.2d 791, 801 (Neb. 2002).

[8]The district court reaffirmed its conclusion by denying Blake's self-styled "motion for reconsideration." See Fed. R. Civ. P. 59(e), 60(b).

## II. DISCUSSION

Blake maintains three claims on appeal: (1) disparate treatment based on sex discrimination; (2) disparate treatment based on age discrimination; and (3) hostile work environment.[9] We review the grant of summary judgment on each claim de novo. See Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). We must affirm summary judgment if "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). In assessing whether such a dispute exists, we view the evidence in the light most favorable to Blake and afford her all reasonable inferences. See Edwards v. Hiland Roberts Dairy, Co., 860 F.3d 1121, 1125 (8th Cir. 2017). Still, there must be enough evidence to allow "'a rational trier of fact'" to find for Blake on the required elements of her claims. Torgerson, 643 F.3d at 1042 (quoting Ricci v. DeStefano, 557 U.S. 557, 586 (2009)); see also Brunsting v. Lutsen Mountains Corp., 601 F.3d 813, 820 (8th Cir. 2010) ("[I]f a nonmoving party who has the burden of persuasion at trial does not present sufficient evidence as to any element of the cause of action, then summary judgment is appropriate.").

### A. Sex Discrimination

An employer cannot discriminate against an employee "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); Neb. Rev. Stat. § 48-1104(1). Blake can defeat summary judgment by "produc[ing] direct evidence of

---

[9]We are receptive to MJ Optical's point that Blake has "comingled [sic] causes of action and blurred applicable legal standards" in getting to this point. For instance, Blake did not explicitly plead a hostile work environment claim and mentioned the phrase only once in her brief in opposition to summary judgment (and in an explanatory parenthetical, no less), but now treats that theory as her primary argument. The district court organized and dismissed her claims, discussing a hostile work environment claim, and because Blake attacks parts from each section of the district court's thorough analysis, we also will address this claim as well. See Winspear v. Cmty. Dev., Inc., 574 F.3d 604, 607 (8th Cir. 2009) (describing the "wholly distinct causes of action" for "[h]ostile work environment and constructive discharge claims" as having "different elements").

discrimination," or by "creat[ing] an inference of discrimination under the burden-shifting framework of McDonnell Douglas." Ames v. Nationwide Mut. Ins. Co., 760 F.3d 763, 767 (8th Cir. 2014) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). Because each path requires that Blake identify an adverse employment action, we skip to that issue to resolve this claim. See id.

Blake admits she was not fired or asked to resign, and she does not claim she was subjected to a pay cut, demotion, or undesirable transfer on the basis of her sex.[10] Rather, Blake's argument that she suffered an adverse employment action rests entirely upon her claim she was constructively discharged because MJ Optical "fail[ed] to control [Marty's] conduct." "To prove a constructive discharge, an employee must show that the employer deliberately created intolerable working conditions with the intention of forcing her to quit." Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 418 (8th Cir. 2010); see also Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996) (describing the objective nature of the intolerability inquiry). An employee claiming constructive discharge shoulders a substantial burden. See O'Brien v. Dep't of Agric., 532 F.3d 805, 810-11 (8th Cir. 2008).

Blake cannot prove constructive discharge, because "[w]e have consistently recognized that an employee is not constructively discharged if she 'quits without giving [her] employer a reasonable chance to work out a problem.'" Trierweiler v. Wells Fargo Bank, 639 F.3d 456, 460 (8th Cir. 2011) (second alteration in original) (quoting Brenneman v. Famous Dave's of Am., Inc., 507 F.3d 1139, 1144 (8th Cir.

---

[10]Blake does not contend her temporary reassignment constituted an adverse employment action. In any event, all evidence suggests the two- to three-day reassignment "was based entirely upon addressing the problem with the frames and had no relation to [Blake's] age or gender." The district court correctly noted this is a legitimate, non-discriminatory reason for the short-term shift in duties. Blake does not argue this proffered reason was mere pretext. See Torgerson, 643 F.3d at 1046.

2007)); see also, e.g., Tidwell, 93 F.3d at 494. Blake did not give MJ Optical a "reasonable chance" to remedy the alleged mistreatment here, as she never told anyone there was a problem in need of fixing. The only time Blake complained about Marty came one day before she quit, and that was about conduct unrelated to her sex. Our cases make clear Blake's failure to seek a solution before quitting—either by telling Marty to stop, or by alerting her immediate supervisor or Mary to the alleged harassment—is fatal to her constructive discharge claim. See, e.g., Trierweiler, 639 F.3d at 460-61; Alvarez, 626 F.3d at 418-19.

Blake tries to avoid this result by arguing any attempt to fix the problem would have been "futile" because Mary "wouldn't have done anything about it." Blake does not support this conclusory allegation with any reasoning or concrete example where Mary ignored such a complaint—in fact, Blake says she considered Mary to be "a good boss" and recalls Mary promising to talk with Marty after the one and only time Blake complained about his behavior. Nor does Blake cite any case recognizing her proposed futility exception, likely because our precedent all but forecloses the notion: "'Part of an employee's obligation to be reasonable . . . is an obligation not to assume the worst, and not to jump to conclusions too fast.'" Alvarez, 626 F.3d at 419 (quoting Smith v. Goodyear Tire & Rubber Co., 895 F.2d 467, 473 (8th Cir. 1990)). Blake knew she could report incidents directly to the company president, Mary, as evidenced by the fact she did just that the day before she quit. We are cognizant of the fact Mary is Marty's mother, and reporting to her "may not have been . . . ideal." Ames, 760 F.3d at 769. Yet Blake "had an obligation not to jump to the conclusion that the attempt would not work and that her only reasonable option was to resign." Id. Before being held responsible for whatever problem there was, MJ Optical was entitled to a reasonable chance to address it. MJ Optical did not get such a chance.

Thus Blake did not suffer an adverse employment action, meaning her claims for disparate treatment on the basis of sex fail.[11]

## B. Age Discrimination

Given our conclusion above, Blake's conventional age-discrimination claims need little discussion. An employer cannot discriminate against an employee "because of such individual's age." 29 U.S.C. § 623(a)(1); Neb. Rev. Stat. § 48-1004(1)(a). Other than a heightened causation requirement for age-discrimination plaintiffs, courts assess age-based claims in the same way they do sex-based claims. See Holmes v. Trinity Health, 729 F.3d 817, 821 (8th Cir. 2013). Again, there must be an adverse employment action. See id. at 821-22. And again, this is where Blake's claims fail. Blake did not alert anyone at MJ Optical to what she perceived to be age discrimination or otherwise attempt to resolve the issue in any way. Therefore she did not provide the company with a reasonable chance to fix the problem before she quit. Our conclusion is the same as it was above—Blake did not suffer an adverse employment action, so she cannot maintain a claim for disparate treatment on account of her age.

## C. Hostile Work Environment

That leaves Blake's allegation she was subjected to a hostile work environment during her time at MJ Optical. Though it is just one way to show sex- or age-based discrimination, a hostile work environment claim is a "distinct cause[] of action" that demands a different evidentiary showing. See Winspear v. Cmty. Dev., Inc., 574 F.3d 604, 607 (8th Cir. 2009) ("The claims have different elements, . . . [and] hostile work

---

[11]We express no opinion on whether Blake's claim of constructive discharge would fail for any of the other reasons stated by the district court or argued by MJ Optical. For instance, we decline to address whether Blake could prove MJ Optical intended to force her to quit. See Fercello v. County of Ramsey, 612 F.3d 1069, 1083 (8th Cir. 2010). We also pass on resolving the significance of Blake's own testimony that she quit for reasons unrelated to sex- or age-based harassment.

environment discrimination can exist absent a 'tangible employment action.'" (quoting Pa. State Police v. Suders, 542 U.S. 129, 143 (2004))).  To prove a hostile work environment claim, Blake must show (1) she "'is a member of the class of people protected by the statute,'" (2) she "'was subject to unwelcome harassment,'" (3) "'the harassment resulted from [her] membership in the protected class,'" and (4) "'the harassment was severe enough to affect the terms, conditions, or privileges of [her] employment.'"[12]  Sellers v. Deere & Co., 791 F.3d 938, 945 (8th Cir. 2015) (quoting Ryan v. Capital Contractors, Inc., 679 F.3d 772, 778 (8th Cir. 2012)).

We only address the second element here, which requires proof Blake considered Marty's conduct unwelcome.  The element's phrasing is somewhat of an oversimplification, as the "'gravamen'" of *any* harassment claim is that the alleged misconduct was "'unwelcome.'"  Quick v. Donaldson Co., 90 F.3d 1372, 1377 (8th Cir. 1996) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 68 (1986)).  Taking direction from the Supreme Court, we have said "[t]he proper inquiry is whether the plaintiff *indicated by [her] conduct* that the alleged harassment was unwelcome."  Id. at 1378 (emphasis added) (citing Meritor, 477 U.S. at 68); see also Jenkins v. Univ. of Minn., 838 F.3d 938, 945 (8th Cir. 2016); Beard v. Flying J, Inc., 266 F.3d 792, 798 (8th Cir. 2001) ("A plaintiff must indicate by her conduct that the harassment was unwelcome.").  The district court concluded Blake failed to adduce sufficient evidence she indicated Marty's conduct was unwelcome.  MJ Optical argues this was right; Blake disagrees.  Though the inquiry is necessarily fact dependent, we find guidance in decisions from our court and other courts that have discussed the competing conclusions urged by each party.

---

[12]When the alleged harasser is a non-supervisor, the plaintiff must also prove the employer knew or should have known about the harassment and failed adequately to address it.  See Rickard v. Swedish Match N. Am., 773 F.3d 181, 184 & n.2 (8th Cir. 2014).  Those elements are not in play here, as Marty was a supervisor.

The first set of cases are those in which there was insufficient indication the conduct was unwelcome. MJ Optical leans heavily on Stuart v. General Motors Corp., 217 F.3d 621 (8th Cir. 2000). In Stuart, there was evidence the plaintiff was subjected to inappropriate sexual comments on a "regular" basis; pornographic photos and offensive signs in her locker and workspace; and "'saluting' by male co-workers" who would grab their genitals and make "'hoo-ha' noises" as she passed. Id. at 632. Though we held a *reasonable person* may consider this conduct to be unwelcome severe or pervasive harassment, we found no evidence *the plaintiff* considered it unwelcome during the time frame at issue. See id. Our decision rested almost entirely on the fact the plaintiff never made timely complaints about the alleged harassment, either formally or informally. See id. at 632 & nn.16-17. This reasoning has doomed plaintiffs in other cases, too. See, e.g., Souther v. Posen Constr., Inc., 523 F. App'x 352, 355 (6th Cir. 2013) (unpublished) (holding "a jury could not find [the] advances unwelcome" where the plaintiff "never complained" to the harasser "or anyone else," notwithstanding the plaintiff's "after-the-fact statement in her deposition" the conduct was unwelcome).

Other cases have looked to the plaintiff's behavior, relationship with the alleged harasser, and history with the company to conclude the plaintiff could not prove the conduct was unwelcome. See, e.g., Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 962, 966 (8th Cir. 1999) (deciding there was insufficient proof where the plaintiff "engaged in behavior similar to that which she claimed was unwelcome and offensive," despite timely complaints and journal entries indicating certain behaviors were unwelcome); Souther, 523 F. App'x at 355 (concluding the conduct was not unwelcome based, in part, on the plaintiff's conduct, the fact she continued to return to the company for work, and her almost thirty-year relationship with the alleged harasser including consensual sex during some of that time); see also Ammons-Lewis v. Metro. Water Reclamation Dist. of Greater Chi., 488 F.3d 739, 746-47 (7th Cir. 2007) (addressing an evidentiary dispute and noting that, although a preexisting relationship by no means nullifies otherwise actionable harassment, "the existence of

a current or former social relationship between the harasser and the harassee can shed light on such relevant questions as whether the complained-of conduct was unwelcome").

The second line of cases are those in which the plaintiff adequately indicated the harassment was unwelcome. Sometimes the plaintiff has satisfied this element by showing she explicitly rebuffed the bad actor's propositions or told the harasser she found the conduct offensive. See, e.g., Williams v. Herron, 687 F.3d 971, 975 (8th Cir. 2012) (deciding the plaintiff "adequately communicated" the conduct was unwelcome where she twice told the harasser it made her "uncomfortable"). Other times the plaintiff has reported the conduct to someone with the authority to address the problem. See, e.g., Beach v. Yellow Freight Sys., 312 F.3d 391, 396 (8th Cir. 2002) (holding evidence was sufficient where the plaintiff "repeatedly complained" to management). We have also found it relevant when the bad actor somehow acknowledged his behavior was unwelcome. See, e.g., Bales v. Wal-Mart Stores, Inc., 143 F.3d 1103, 1108 (8th Cir. 1998) (affirming jury verdict where the harasser admitted the plaintiff had "complained to him 'four or five' times about his conduct towards her"). Oftentimes the plaintiff has indicated the harassment was unwelcome in more than one of these ways. See, e.g., Jenkins, 838 F.3d at 943, 945 (concluding the plaintiff satisfied her burden where she told the bad actor "multiple times" she was not interested in him, she notified a counselor and her academic advisor about the harassment, and the bad actor "was aware that [the plaintiff] found his advances unwelcome" given that "he 'apologized if his expressing interest in [the plaintiff] made her uncomfortable'"). There may well be other ways a plaintiff could adequately indicate unwelcomeness, these simply appear to be the most common.

The evidence here puts Blake's claims within the first category of cases. Blake and Marty have known each other for over forty years. See, e.g., Souther, 523 F. App'x at 355. Although we cannot accept MJ Optical's suggestion their relationship was akin to one between "an aunt and nephew"—and in any event we fail to see how

such a "familial" relationship would excuse Marty's behavior—Blake admitted their relationship was positive for most of that time. This is reflected in the various ways their relationship extended beyond the workplace. After the complained-of conduct began in 1999, Blake continued to work at MJ Optical for almost fifteen years without once telling Marty to stop or complaining to anyone else at MJ Optical.[13] See Stuart, 217 F.3d at 632; cf. Williams, 687 F.3d at 975; Beach, 312 F.3d at 396.

During those fifteen years, Blake and Marty joked around with one another; they occasionally exchanged "I love yous"; and Blake sometimes touched Marty "between the shoulders." While we are not under any illusion these acts are similar in kind to Marty's unprofessional and boorish behavior, it does nothing to convey the allegedly severe and pervasive conduct was unwelcome. See also Scusa, 181 F.3d at 966. There is no evidence Marty was aware his conduct distressed Blake, either. Quite the opposite—Marty apparently saw his conduct as an attempt "to lighten [the] mood a bit," and Blake recalls Marty would say she "need[ed] to be happy." Cf. Jenkins, 838 F.3d at 945; Bales, 143 F.3d at 1108. When Blake finally did go to Mary to complain about how Marty treated her, she did not mention any of the conduct she now claims created a hostile work environment. Other than "a dirty look"—which it is unclear whether anyone even noticed—the first indication Blake gave that she felt discriminated against was when she filed her administrative charge alleging as much. This is too little, too late. Blake cannot show she indicated in a

---

[13]Two points merit elaboration. First, unlike in constructive discharge claims, our hostile work environment cases do not yet recognize any bright-line rule requiring a plaintiff to have reported the alleged harassment to *management* in order to prove conduct was unwelcome. We create no such rule here, either—to the extent the district court's decision suggested otherwise, it was wrong (or at least premature). Second, Blake stresses the lack of any written harassment or reporting policy at MJ Optical. While we agree this may be unwise (even for a small, family-run company like MJ Optical), it does not excuse the need for some adequate indication of unwelcomeness. In any event, there is no question Blake knew she could report directly to Mary, just as she did the day before she quit.

timely manner the complained-of conduct was unwelcome, thus she cannot maintain a claim for hostile work environment.[14]

## III.  CONCLUSION

We affirm.

_____

---

[14]We issue no opinion on whether the harassment was based on sex or age (an element MJ Optical challenges), or was severe or pervasive enough to alter a term, condition, or privilege of Blake's employment (a requirement the district court found unsatisfied).  See Sellers, 791 F.3d at 945.