# United States Court of Appeals

### For the Eighth Circuit

_____

No. 16-3067

_____

The Estate of Chandler J. Barnwell, by and through his parents, Michael and Anna Barnwell, Individually and upon behalf of his heirs

*Plaintiffs - Appellants*

v.

Linda Watson, Dr., EdD, Superintendent of the School Board of the Little Rock Independent School District, in her official capacity

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: April 6, 2017
Filed: January 26, 2018

_____

Before COLLOTON and BENTON, Circuit Judges, and GERRARD,[1] District Judge.

_____

GERRARD, District Judge.

_____

[1]The Honorable John M. Gerrard, United States District Judge for the District of Nebraska, sitting by designation.

After their son tragically committed suicide, the plaintiffs, Michael and Anna Barnwell, sued the superintendent of their son's school district, alleging that the school had discriminated against their son on the basis of disability by failing to adequately protect him from being bullied by other students. But the district court[2] found no evidence to support the Barnwells' claim, and granted the superintendent's motion for summary judgment. We affirm the district court's judgment.

I.

The Barnwells' son, Chandler, was 16 years old at the time of his death. He had been diagnosed over the course of his adolescence with attention deficit hyperactivity disorder; depression and anxiety disorders; oppositional defiant disorder; and most pertinently Asperger's disorder, a condition on the autism spectrum characterized by impaired social skills. Children with Asperger's disorder lack awareness of social boundaries, among other things, and as a result can unwittingly engage in inappropriate behavior. This can include staring at others and making inappropriate or hurtful remarks. In Chandler's case, it also produced speech patterns and mannerisms that could be perceived by others as unusual or effeminate.

Chandler had behavioral issues, at school and home, during grade school and middle school. Chandler completed kindergarten and his first 5 years of grade school at the Heritage Christian School, and at age 12 started the sixth grade at St. Theresa Catholic School. That November, he was hospitalized for a week of inpatient evaluation and treatment after he reported to St. Theresa's principal that he was hearing voices in his head. But the record does not reflect a diagnosis of schizophrenia–Chandler had also reported other things, such as alleged abuse, that were not substantiated. In his mother's words, he "embellished on the truth a lot."

---

[2]The Honorable James M. Moody, Jr., United States District Judge for the Eastern District of Arkansas.

After Chandler's discharge from treatment, he was enrolled in the Little Rock Independent School District (the District), at Pulaski Heights Middle School, to complete sixth grade. Chandler's time at Pulaski Heights was unhappy–according to Mrs. Barnwell, he was bullied by other students, and was eventually suspended for the end of the school year after saying he wanted to hit the students who were harassing him. For the 2007-08 school year–Chandler's seventh grade year–he was re-enrolled at Heritage Christian School. But he was expelled from Heritage Christian after he set a fire in a trash can while smoking in the bathroom. So, the Barnwells home-schooled Chandler from October 2007 to August 2009.

During that time, Chandler was again hospitalized following a putative suicide attempt in December 2008. Chandler's grandmother had summoned authorities when Chandler cut at his wrists and drank hydrogen peroxide, although hospital records reflect that Chandler's efforts consisted of "scratches" on his wrist and ingestion of a "minimal" amount of hydrogen peroxide. Chandler told medical staff at the hospital that a voice had told him to kill himself. But the family's therapist, Ruth Fissel, said she believed Chandler's actions were more an impulsive bid for attention than a serious attempt at self-harm. There is no evidence that representatives of the District were ever made aware of this incident.

Chandler wanted to go back to school for the 2009-10 school year, so he was enrolled back in the District at Forest Heights Middle School. Chandler was 15 years old by then, and was starting the eighth grade.[3] In an August 2009 conference at Forest Heights, Mrs. Barnwell did express her concern about Chandler being bullied, because of his experience during sixth grade at Pulaski Heights. But Chandler had a relatively good year at Forest Heights. He was suspended for a week in December

---

[3]Chandler had repeated kindergarten and was restarting eighth grade after having completed part of the eighth grade curriculum during home schooling, so by this time he was roughly 2 years older than most of the students in his class.

2009 for smoking marijuana in the bathroom, but according to Mrs. Barnwell, he did well in school and made friends. While he was not bullied at school, however, there were ongoing conflicts with other children in his neighborhood. And Chandler made some other poor decisions, such as taking medications from his mother and grandmother.

Chandler stayed in the District and started ninth grade at Parkview Arts Science Magnet High School in August 2010. Chandler's educational management team, which included Mrs. Barnwell and school resource personnel, met on September 9. The primary issue addressed at that meeting was Chandler's difficulty getting to class on time–he had already accumulated several tardies because, according to Chandler, other students were impeding him in the halls. On at least one occasion, his books were knocked from his hands. The educational management team recommended that Chandler be dismissed from his classes 5 minutes early to allow him to pass through the halls, although it was another month before Parkview's principal, Dexter Booth, approved that recommendation. Mrs. Barnwell said that Chandler was permitted to leave class early because of her concern that being stuck in the hall between classes "would set [Chandler] up to be bullied."

Chandler was involved in an altercation with another student in class on October 7. Although accounts–including Chandler's own accounts–differ on some details, the version of events Chandler related to his mother was representative. According to Chandler, a girl in the class called him "fruity" and rudely accused him of coughing on her. He objected to her rudeness, she called him a "faggot," and he retorted that she was a "nappy-headed bitch." She drew back her hand as if to strike him, but he struck her first with an open hand. Both students served a one-day suspension, and there was no further trouble between them.

Chandler continued to have trouble in his neighborhood, however, including at the bus stop in the morning. Eventually, he stopped riding the bus and his parents

transported him to and from school. Chandler's difficulties at the bus stop were not reported to the District.

As part of his individualized education plan, Chandler was included in a "pragmatics group," a social skills group for students with varying disabilities intended to help students develop their pragmatic social skills under the guidance of a school resource educator. Chandler's educational needs were re-evaluated in November, including an IQ test, achievement testing, adaptive behavior testing, and speech and language testing. The evaluation was completed by Jody Cerrato, the speech therapist who taught Chandler's social skills group. As pertinent, on the evaluation form, Cerrato checked an item on a list of "Observed Behaviors" that read: "Is bullied by others." Cerrato explained, however, that he checked that item not because of observed bullying, but because susceptibility to bullying is associated with students on the autism spectrum.

Chandler was doing reasonably well in school, maintaining a 'B' average. But by late November, Chandler wanted to leave Parkview. He told Fissel that he wanted to home school again, or quit school and get his GED, because he didn't have friends at school. Fissel and Mrs. Barnwell suggested looking into early graduation, and told Chandler to talk to his school counselor. So, in a letter dated December 1, Chandler wrote to the counselor that he was "willing to do anything to finish high school early" because he didn't "have any friends here because the students aren't mature enough to handle someone that's different and I can't handle being an outcast for four more years and for that reason I plead that you help me finish high school A.S.A.P." The counselor called Mrs. Barnwell and advised that Chandler's options were limited: he could attend an alternative school, take core classes at community college (which would mean Chandler could not take the drama classes he enjoyed), or wait until eleventh grade and ask for permission to graduate early.

There is no evidence, however, expressly connecting Chandler's request to leave Parkview to bullying or harassment. One of Chandler's teachers asked why he wanted to graduate early, and Chandler replied that he was "ready to move and to get on with life and experience what else [was] out there for him."

Chandler's education management team met again on December 2, including Fissel this time. Both Fissel and Mrs. Barnwell testified that they said at the December 2 meeting that they were concerned Chandler was being bullied. But they could not say whether the bullying might have been occurring at school or elsewhere, or whether the possible bullies were Parkview students. Chandler had not reported that he was being bullied, to either Fissel or Mrs. Barnwell. Mrs. Barnwell had not seen or heard any evidence Chandler had been fighting. The only arguable instance of bullying of which Mrs. Barnwell was aware at that point–and the only instance that, to her knowledge, the District knew about–was the October 7 classroom altercation.

According to Fissel, bullying was not discussed extensively at the December 2 meeting. Rather, the primary topic was Chandler's social skills group–Fissel and Mrs. Barnwell suggested that Chandler be moved to a higher-functioning group, and the educational management team agreed. In fact, at no point were the members of the educational management team asked to do anything that they refused to do.

The incident that presumably precipitated Chandler's suicide occurred in class on December 7. Although accounts are secondhand, the gist of the incident is that Chandler was being harassed throughout a class, and retaliated with an extremely rude remark about another student's mother. The other student replied that Chandler should go home and kill himself. That evening, according to Mrs. Barnwell, Chandler seemed fine before his parents left the house for a previously scheduled appointment. But while they were gone, Chandler took his own life.

More evidence suggesting possible bullying was revealed in the days following Chandler's death. A student reported that on one occasion, two girls had made fun of Chandler's accent during drama class, but that the teacher had put a stop to it. And another Parkview student, who reported being a friend of Chandler's, said that Chandler was being made fun of before and after school in the school courtyard "almost daily." Mrs. Barnwell was told that people on Facebook were saying that Chandler had been bullied because of perceptions about his sexuality. Mrs. Barnwell was also made aware of a dialogue between Chandler and a friend on Facebook from just before Chandler's death, in which Chandler said he was "stressed out" and "felt like he was losing it."

A little over a month after Chandler's suicide, Fissel and the Barnwells met with Principal Booth to try and start an investigation into the death. According to Mrs. Barnwell, Booth was not interested in the names of the students he was told might have information about events prior to Chandler's death, and he denied that bullying occurred in his school. According to Mrs. Barnwell, Booth instructed faculty not to talk about Chandler's death, and would not permit a student who had written a poem inspired by Chandler to perform the poem at the school talent show. And Mrs. Barnwell was told that before his death, Chandler had given a USB drive to another student, and after Chandler's death a number of students had been looking at the drive in the school library, but it had been confiscated by the school counselor and had not been seen again.

Unsatisfied, the Barnwells complained to the state Department of Education and then the federal Department of Education's Office of Civil Rights, and later pursued this litigation against the superintendent of the District in her official capacity. As relevant, the Barnwells alleged discrimination on the basis of disability in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. But the district court, finding insufficient evidence to support their claim, granted the superintendent's motion for summary judgment. The Barnwells appeal.

II.

We review the grant of summary judgment *de novo*. *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 825 (8th Cir. 2017). We affirm summary judgment if there is no genuine dispute as to any material fact. *Id.* In assessing whether such a dispute exists, we view the evidence in the light most favorable to the Barnwells and afford them all reasonable inferences. *Id.* But there must still be enough evidence to allow a rational trier of fact to find for the Barnwells on the required elements of their claim. *Id.* And while the non-moving party receives the benefit of all reasonable inferences supported by the evidence, the non-moving party is still obliged to come forward with specific facts showing that there is a genuine issue for trial. *B.M. v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013).

The only claim the Barnwells are pursuing is the school district's alleged violation of § 504, which provides that "[n]o otherwise qualified individual with a disability . . . shall . . . be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." § 794(a); *see Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850, 856 (8th Cir. 2000). The Barnwells' argument on appeal is twofold: they contend that school employees failed to adequately address allegations that Chandler was being bullied and harassed, and they contend that Booth failed to conduct an adequate investigation into those allegations after Chandler's death.

A.

A plaintiff's prima facie case under § 504 requires a showing that the plaintiff (1) was a qualified individual with a disability; (2) was denied the benefits of a program or activity of a public entity receiving federal funds; and (3) was discriminated against based on his disability. *M.Y. v. Special Sch. Dist. No. 1*, 544 F.3d 885, 888 (8th Cir. 2008). More specifically, we have said that a claim under §

-8-

504 in the context of education of handicapped children requires parents to show that the school district acted in bad faith or with gross misjudgment by departing substantially from accepted professional judgment, practice or standards as to demonstrate that those responsible actually did not base the decision on such a judgment. *M.Y.*, 544 F.3d at 889; *see B.M.*, 732 F.3d at 887.

That standard is unmet here. As described in detail above, there is nothing in the record to establish that school officials knew of any specific instance of bullying before Chandler's death, aside from the October 7 altercation (for which both students arguably bore some responsibility). The District responded to that incident immediately, and there was no further trouble between those two students–which is hardly indicative of bad faith or gross misjudgment on the District's part. Similarly, even if the Barnwells are given the benefit of an inference that Chandler's problems getting through the hallways were the result of bullying or harassment, the District acted to solve the problem. While there was some delay in approving Chandler's early dismissal from class, the issue had still been addressed 2 months before Chandler's death.[4]

The Barnwells focus on the December 2 meeting of Chandler's educational management team, at which the Barnwells say concerns about bullying were raised. But even then, those concerned did not know where or by whom Chandler might have been bullied, nor did they have any specific reports or observations to substantiate their concerns. A failure to proactively address such inchoate worries falls well short of establishing the level of bad faith or gross misjudgment needed to support a § 504 claim: § 504 does not create general tort liability for educational malpractice. *B.M.*,

---

[4]The superintendent argues that events before November 27, 2010 are time-barred by the applicable statute of limitations. But even so, events outside a limitations period may be relevant to acts or omissions alleged to have occurred within the limitations period. *See Kline v. City of Kansas City, Fire Dep't*, 175 F.3d 660, 667 (8th Cir. 1999).

732 F.3d at 887. The same reasoning applies to the Barnwells' argument that when Chandler said he wanted to leave school, the school counselor should have asked why. And the Barnwells cannot say, even now, what his answer would have been.

In sum, even crediting the evidence discovered after Chandler's death that he was being harassed at school, there is no evidence that the District knew or even should have known about it. Under these circumstances, § 504 "do[es] not permit the federal courts to second-guess the educational decisions of school officials." *See B.M.*, 732 F.3d at 888.

The Barnwells also argue that despite their failure to adduce evidence of bad faith or gross misjudgment, summary judgment was nonetheless precluded because the District's witnesses were not credible. But that would not help them meet their own burden of producing evidence to support the essential elements of their claim. It is well-established that when a movant for summary judgment points out to the court an absence of evidence to support an essential element for which the nonmovant will have the burden of proof at trial, the nonmovant must make a sufficient showing that there is a genuine issue of fact as to that element. *Beyer v. Firstar Bank, N.A.*, 447 F.3d 1106, 1108 (8th Cir. 2006).

So, to defeat summary judgment, the Barnwells were required to present affirmative evidence, not simply contend that a jury might disbelieve the superintendent's evidence. *See Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 886 (8th Cir. 2016); *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 428 (8th Cir. 1999). The Barnwells failed to do so, and "a complete failure by the non-moving party to make a showing sufficient to establish the existence of an element essential to that party's case necessarily renders all other facts immaterial." *B.M.*, 732 F.3d at 886 (quotation omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

B.

But the Barnwells suggest that the appropriate rubric for evaluating their claim is not the "bad faith or gross misconduct" standard that is generally applied in § 504 cases based on a school's own direct conduct. Rather, they contend we should apply the "deliberate indifference" standard promulgated by the Supreme Court in *Davis v. Monroe Cnty. Bd. of Educ.* for evaluating Title IX gender discrimination claims based upon alleged student-on-student harassment. 526 U.S. 629 (1999).

In *M.P. v. Indep. Sch. Dist. No. 721*, we applied the "bad faith or gross misjudgment" standard to a § 504 claim premised in part on allegations of student-on-student harassment. 326 F.3d 975, 982 (8th Cir. 2003). The parties apparently assumed that the same standard should be applied to all § 504 claims regardless of the underlying allegations, and this court found that there was sufficient evidence to meet the "bad faith or gross misjudgment" standard without acknowledging *Davis* or discussing whether the "deliberate indifference" standard of *Davis* should have applied to the plaintiffs' student-on-student harassment claims. *See id.* And since then, several other courts have concluded that the *Davis* "deliberate indifference" standard should be applied instead when a § 504 claim is based upon allegations of student-on-student harassment. *S.B. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 75-77 (4th Cir. 2016); *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 995-997 (5th Cir. 2014); *see S.S. v. E. Kentucky Univ.*, 532 F.3d 445, 453-54 (6th Cir. 2008); *see also Long v. Murray Cnty. Sch. Dist.*, 522 F. App'x 576, 577 (11th Cir. 2013).

But we need not definitively resolve that question in this case, because the evidence also fails to satisfy the *Davis* standard. Under that standard, an educational institution is liable only where it is (1) deliberately indifferent (2) to known acts of discrimination (3) which occur under its control. *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017). Additionally, the discrimination must be so severe,

pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school. *Id.* (citing *Davis*, 526 U.S. at 650).

There is no evidence of that degree of harassment here. "It is not enough to show . . . that a student has been teased . . . or called offensive names." *Davis*, 526 U.S. at 652 (citations and quotations omitted). Rather, the Supreme Court instructed in *Davis*, with respect to gender-based harassment, that courts must remember

> schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that [the statute] is designed to protect.

*Id.* at 651-52 (citation omitted). Even giving the Barnwells the benefit of every reasonable inference, the record in this case does not show Chandler to have been the target of anything more than the sort of hurtful but immature behavior the Supreme Court has expressly said is not actionable under federal anti-discrimination law.

Nor, for reasons similar to those explained above, does the record establish deliberate indifference. An educational institution is "deliberately indifferent" to acts of student-on-student harassment only where the school's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648. This "clearly unreasonable" standard is intended to afford flexibility to school

-12-

administrators. *Roe*, 746 F.3d at 882. And given the limited information known to the District before Chandler's death, the evidence would not support a conclusion that the District's response to the situation was clearly unreasonable.

## C.

Finally, the Barnwells take issue with Booth's conduct after Chandler's death. Booth, they charge, failed to follow applicable federal and local policies in investigating (or failing to investigate) whether Chandler had been bullied or harassed before his death, and according to the Barnwells "he actively covered up" bullying and harassment. They also assert Booth failed to provide grief counselors at Parkview and silenced those who wanted to talk about Chandler's suicide.

But it is not clear how those allegations support a claim under the Rehabilitation Act. The Barnwells cite no authority for the proposition that a school district can discriminate against a disabled student in violation of § 504 after his death by failing to investigate harassment that might have occurred before he died. Nor is there authority for the proposition that a school district can discriminate against a disabled student in violation of § 504 by failing to respond to the student's death with an appropriate degree of sensitivity. Whether or not a claim might arise out of such allegations, it is not a claim that can be asserted under § 504, and that conclusion is dispositive of this appeal.

## III.

The district court's judgment with respect to the Barnwells' claim in this tragic case is affirmed.

_____

-13-