# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-3127

_____

Monica Watson

*Plaintiff - Appellant*

v.

Denis McDonough, Secretary, Department of Veterans Affairs[1]

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: November 18, 2020
Filed: May 6, 2021

_____

Before COLLOTON, ARNOLD, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Monica Watson sued the Secretary of the Department of Veterans Affairs under
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., for race

---

[1]Secretary Denis McDonough is substituted for his predecessor pursuant to
Federal Rule of Appellate Procedure 43(c).

discrimination, retaliation, constructive discharge, and the hostile work environment she experienced during her employment at the Kansas City Veterans Affairs Medical Center. The district court[2] entered summary judgment in favor of the Department of Veterans Affairs (VA). Watson now appeals, and we affirm.

I.

Watson, who is a Black woman, began working for the VA as a Medical Records Technician Coder in 2006. In that role, she was responsible for inputting healthcare providers' notes into patient medical records. In September 2014, the VA received new qualification standards for certain agency positions, including Watson's. Under this new framework, Medical Records Technician Coders could rise only to General Schedule (GS) 8, a pay grade one level below the one Watson already held. To avoid reducing the salaries of GS-9 medical coders like Watson, the VA "grandfathered" them into new roles at their existing pay grade. Watson and four other GS-9 medical coders were accordingly reclassified as Coding Document Improvement Program (CDI) coders. The new CDI coders, now in a working group referred to as the CDI program, remained responsible for performing some coding but also took on the role of auditing and training healthcare providers to improve the quality of their medical documentation. Watson's salary remained the same.

Laurie Schwab was Watson's supervisor during this period. According to Watson, Schwab failed to provide the CDI coders, three out of four of whom were Black women, with training and guidance on their new auditing and teaching duties, but she nonetheless "expected [them] to perform perfect work." Record evidence shows that the CDI coders, as well as the VA employees' union president, felt the CDI coders were "being isolated," "set up for failure," and "targeted by Schwab."

---

[2]The Honorable Roseann A. Ketchmark, United States District Judge for the Western District of Missouri.

During an October 19, 2015 staff meeting, Schwab and another supervisor told Watson and the other CDI coders that senior VA officials were considering disbanding the new CDI program. Both parties acknowledge that the program was contributing to a growing backlog of medical coding work because former medical records coders were now tasked with additional auditing and training responsibilities. Watson and the other CDI coders were assigned extra coding work to "help with the backlog."

Watson and Schwab's professional relationship became increasingly strained. A few days after the October 19 meeting, Schwab evaluated Watson's job performance as "Fully Successful," rather than "Outstanding" or "Excellent." This rendered Watson ineligible for a Special Advancement Award. Then, during a March 6, 2016 meeting, Schwab "expressed a lack of confidence in the ability of [Watson] and another CDI [coder] to perform the training duties of the CDI[] positions." According to the employees' union representative, who also attended the meeting, Schwab told Watson and another coder, who is also Black, that they "did not know how to talk to people" and that "she could not put [them] in front of physicians in a classroom setting . . . because it would make her look bad."

Two weeks later, Schwab gave Watson a written counseling raising "concerns about [her] failure to follow instructions as a VA employee." The counseling memorandum asserts that on two occasions Watson failed to turn in work assignments by the agreed upon deadline. The memorandum instructed that, going forward, Watson was to send presentation materials to Schwab "to proof" before meetings with healthcare providers, address Schwab "professionally" in emails, and "have eye contact and speak back if necessary" when talking to her.

A few days after receiving the counseling memorandum, Watson began attending Equal Employment Opportunity (EEO) counseling at the VA. When

counseling concluded, the VA issued Watson a Notice of Right to File a Discrimination Complaint. She resigned from the VA on May 27, 2016 and filed a formal discrimination complaint with the agency three weeks later. The VA's Office of Employment Discrimination investigated and adjudicated the complaint.

As part of that process, Watson provided an affidavit stating that Schwab had told a previous VA employee there were "too many blacks" working at the Kansas City VA.[3] She also averred that under Schwab's supervision "ten African Americans ha[d] either been demoted, terminated, transferred, resigned, forced [to retire] or quit." The VA ultimately determined that Watson "failed to demonstrate by a preponderance of the evidence that she was discriminated against as alleged." The agency notified her that she could either appeal the decision or pursue a civil action in federal district court. Watson chose the latter path and filed this Title VII lawsuit.

II.

We review de novo a grant of summary judgment, "construing all facts and making all reasonable inferences favorable to the nonmovant." Elec. Power Sys. Int'l, Inc. v. Zurich Am. Ins. Co., 880 F.3d 1007, 1009 (8th Cir. 2018) (cleaned up). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Congress enacted Section 717 of Title VII, 42 U.S.C. § 2000e-16, "to remedy discrimination in federal employment." West v. Gibson, 527 U.S. 212, 218 (1999).

---

[3]In reviewing the district court's decision, we do not consider the undated, unsigned affidavit of a Black former VA employee that Watson submitted in support of her opposition to the motion for summary judgment. See Mason v. Clark, 920 F.2d 493, 495 (8th Cir. 1990) ("We have no hesitation in stating that an unsigned affidavit is not sufficient evidence in support of a motion for summary judgment.").

Where, as here, the plaintiff has not presented direct evidence to support her Title VII claims, we apply the burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).[4]  <u>See</u> <u>Elnashar v. Speedway SuperAmerica, LLC</u>, 484 F.3d 1046, 1055 (8th Cir. 2007) (applying the burden-shifting framework to race discrimination, hostile work environment, and constructive discharge claims). Under <u>McDonnell Douglas</u>, the plaintiff has the initial burden to establish a prima facie case for each claim.  <u>See</u> <u>Pye v. Nu Aire, Inc.</u>, 641 F.3d 1011, 1019 (8th Cir. 2011).  Successfully doing so "creates a rebuttable presumption of discrimination" and shifts the burden to the defendant to produce "a legitimate, nondiscriminatory reason for its decision."  <u>Id.</u>  If the defendant manages to do so, "the presumption disappears," and the burden returns to the plaintiff to prove "that the proffered reason was pretext for discrimination."  <u>Id.</u>

The district court concluded that Watson's claims failed at the first step because she did not establish a prima facie case of race discrimination, hostile work environment, retaliation, or constructive discharge.  Her race discrimination claim is based on the assertion that she was treated less favorably than white medical coders at the VA.  Specifically, Watson asserts that supervisors unfairly assigned her additional coding work, among other actions, thereby limiting her opportunities to master the training functions of her new CDI role and to become eligible for promotion.  To make out a prima facie case of race discrimination, "a plaintiff must show: (1) she is a member of a protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) the circum-stances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)."  <u>Carter v. Pulaski</u>

---

[4]We do not address whether Watson exhausted her administrative remedies. The VA now acknowledges that it actually investigated Watson's hostile work environment claim and that she has therefore exhausted it.  Whether she exhausted her retaliation claim is a closer question that we need not address because the claim fails on the merits.  <u>See</u> <u>Ballard v. Rubin</u>, 284 F.3d 957, 964 n.6 (8th Cir. 2002).

Cnty. Special Sch. Dist., 956 F.3d 1055, 1058 (8th Cir. 2020) (cleaned up) (quoting Macklin v. FMC Transp., Inc., 815 F.3d 425, 427 (8th Cir. 2016)).

There is no dispute that Watson, a Black woman, is a member of a protected class, or that she performed her job satisfactorily. But under this circuit's precedent, many of the events Watson presents as adverse employment actions—the decision not to "board"[5] the CDI position, inadequate training on CDI duties, assignment of additional coding work, her performance review, and the written counseling—are not adverse employment actions for purposes of Title VII. See, e.g., Box v. Principi, 442 F.3d 692, 697 (8th Cir. 2006) ("[A]n employer's denial of an employee's request for training is not, without more, an adverse employment action.") (quoting Griffith v. City of Des Moines, 387 F.3d 733, 737 (8th Cir. 2004)); Sallis v. Univ. of Minn., 408 F.3d 470, 476 (8th Cir. 2015) (stating that "minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not" rise to the level of an adverse employment action); Rebouche v. Deere & Co.. 786 F.3d 1083, 1088 (8th Cir. 2015) ("[A] negative performance review on its own does not constitute an 'adverse employment action' . . . unless the review was relied on in making promotion [, demotion, or termination] decisions about the employee."); Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs., 728 F.3d 800, 805 (8th Cir. 2013) (holding that "the length of [plaintiff's] performance log and the number of coaching and counseling sessions she has endured" were not, in and of themselves, materially adverse employment actions).

Watson also claims that the VA passed over her for promotion opportunities, which we have recognized can constitute an adverse employment action. See AuBuchon v. Geithner, 743 F.3d 638, 643 (8th Cir. 2014). She asserts that white medical coders were promoted when she was not, and that the additional coding work

---

[5]"Boarding" is a process by which the agency examines a position's responsibilities and duties to determine where it should fall on the GS pay scale.

she was assigned caused her to miss out on opportunities for professional development that would have led to promotion. But Watson has not identified any specific position she expressed interest in and was passed over for. See Chambers v. Wynne Sch. Dist., 909 F.2d 1214, 1217 (8th Cir. 1990) (explaining that although "failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie claim [of discrimination]," the plaintiff must show that she "made every reasonable attempt to convey h[er] interest in the job to the employer" (quoting EEOC v. Metal Serv. Co., 892 F.2d 341, 348 (3d Cir. 1990))).

In addition, Watson relies on our decision in Kim v. Nash Finch Co., 123 F.3d 1046 (8th Cir. 1997), to argue that the VA's conduct, when considered as a whole, amounts to an adverse employment action. In Kim, we recognized that a series of "serious employment consequences" that did not result in discharge, demotion, or suspension nevertheless constituted an adverse employment action sufficient to support a claim for retaliation. Id. at 1060. Immediately after the plaintiff in that case filed an employment discrimination complaint, his employer "began to systematically retaliate against him" by reducing his job responsibilities, giving him significantly lower performance evaluations, requiring he undergo remedial training, and placing negative reports in his personnel file. Id. The employer's conduct in Kim was suggestive of a cohesive effort to undermine the plaintiff. Here, in contrast, Watson has not explained why or how we should aggregate the individual events she takes issue with to find an adverse employment action. Summary judgment on the race discrimination claim was warranted.

As to Watson's hostile work environment claim, to establish a prima facie case she must show that: "(1) she is a member of the class of people protected by [Title VII], (2) she was subject to unwelcome harassment, (3) the harassment resulted from her membership in the protected class, and (4) the harassment was severe enough to affect the terms, conditions, or privileges of her employment." Mahler v. First Dakota Title Ltd. P'ship, 931 F.3d 799, 806 (8th Cir. 2019) (quoting Blake v. MJ

Optical, Inc., 870 F.3d 820, 827 (8th Cir. 2017)). Assuming that Watson, a member of a protected class, was subject to racial harassment during her time at the agency, the evidence does not support a finding that the harassment materially affected the conditions of her employment. Any race-based harassment in the workplace is unreasonable and may, in turn, have the effect of interfering with an employee's performance. But to establish a prima facie case of hostile work environment under Title VII, there must be evidence that the harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

While the record contains evidence of interactions between Schwab and Watson that could be understood as harassment, Watson has not shown that these experiences affected "a term, condition, or privilege of [her] employment." Duncan v. County of Dakota, 687 F.3d 955, 959 (8th Cir. 2012). Watson's pay grade and salary remained the same throughout the timeframe at issue. Similarly, she has not presented evidence that the additional coding work she was assigned "resulted from her membership in the protected class." Mahler, 931 F.3d at 806. We affirm summary judgment on the hostile work environment claim.

Next, Watson claims that Schwab retaliated against her for raising concerns about a hostile work environment to her employees' union representative. To establish a prima facie case of retaliation, she must show that: (1) "[s]he engaged in protected conduct, (2) [s]he suffered a materially adverse employment action, and (3) the adverse action was causally linked to the protected conduct." Pye, 641 F.3d at 1021. Because there is no evidence of an adverse employment action, the district court properly granted summary judgment to the VA on the retaliation claim.

Finally, Watson argues that the district court erred in granting summary judgment on her constructive discharge claim. To succeed on this claim, Watson "would have to show that [the VA] created 'working conditions that were so

intolerable that a reasonable person in her position would have felt compelled to resign." Garrison v. Dolgencorp, LLC, 939 F.3d 937, 943 (8th Cir. 2019) (cleaned up) (quoting Green v. Brennan, 136 S. Ct. 1769, 1776 (2016)). Watson has presented evidence that the conditions of her employment at the VA were far from ideal, but not that they were intolerable. Moreover, Watson's letter of resignation states that she was "moving forward in [her] career path and ha[d] accepted a professional position that [would] allow [her] to fully utilize [her] plethora of skills and knowledge." Although she frames the job postings Schwab forwarded to her during late 2015 and early 2016 as an effort to push her out of the VA, the record contains uncontested evidence that Watson and other CDI coders had asked Schwab and another supervisor for help finding new positions. Evidence that Watson was proactively seeking new employment in the months leading up to her resignation does not necessarily foreclose her claim for constructive discharge, but it does nothing to revive it in light of the fact that she has not presented evidence of intolerable working conditions. We agree with the district court that she has failed to establish a prima facie case of constructive discharge.

     We affirm the grant of summary judgment.

_____